Richard MORALES, Plaintiff–
Appellant,

v.

QUINTEL ENTERTAINMENT, INC.
and Peter Stolz, Defendants–
Appellees.

No. 99–9374.

United States Court of Appeals,
Second Circuit.

Argued Sept. 25, 2000.

Decided May 2, 2001.

David Lopez, Southampton, NY, (Albert D. Barnes, Southampton, NY, of counsel), for Plaintiff–Appellant.

Bruce E. Clark, New York, NY, (Mark E. Coyne, Sullivan & Cromwell, New York, NY, of counsel), for Defendant–Appellee Peter Stolz.

Allan A. Capute, Washington, DC, (David M. Becker, Eric Summergrad, Meyer Eisenberg, Securities and Exchange Commission, Washington, DC, of counsel), filed a brief for the Securities and Exchange Commission, Amicus Curiae, in support of appellant.

Before: CARDAMONE, JACOBS, and SACK, Circuit Judges.

.CARDAMONE, Circuit Judge:

This appeal presents important issues relating to "short-swing" trading under § 16(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78p(b) (1994).[1] Because defendant Peter Stolz concededly does not own in his name ten percent or more of the stock in which he, as an insider, is alleged to have traded, our discussion necessarily focuses on whether defendant owns ten percent as a "beneficial owner." The Exchange Act did not at the time of its enactment define the term "beneficial owner." That obvious gap was filled in over many years by case law which, as it now turns out, incorrectly defined the term. Although the statute and regulations in existence prior to the deci-

---

1. We are aware that Congress recently amended § 16(a) and (b) to include liability based on the purchase or sale of a security-based swap agreement, as defined in § 206B of the Gramm Leach Bliley Act. *See* Consolidated Appropriations FY 2001, Pub. L. No. 106–554, § 303(g), 114 Stat. 2763, 2764 (2000). These amendments however, have no bearing on our analysis of the merits of this appeal.

sional law failed to give even a few faint hints as to the meaning of "beneficial owner," the Securities and Exchange Commission (Commission) in its 1991 regulations defining the phrase nonetheless rejected existing case law. We construe those regulations on this appeal.

Plaintiff Richard Morales appeals a judgment entered on October 28, 1999 in the United States District Court for the Southern District of New York (Conner, J.), granting summary judgment to defendants Stolz and Quintel Entertainment, Inc. (Quintel). Morales claims Stolz realized illegal profits on short-swing trades in shares of Quintel common stock, in violation of § 16(b) of the Exchange Act. He contends the district court erred in finding Stolz exempt from § 16(b) on the ground that, as a matter of law, he was not a "beneficial owner" of ten percent or more of Quintel stock. Because in our view a trier of fact could find that Stolz' concerted activities with two other Quintel shareholders rendered him a beneficial owner of their Quintel stock, thereby placing him above the ten-percent threshold, we vacate the judgment appealed from, in part, and remand.

## BACKGROUND

Although the events leading up to this lawsuit are generally not in dispute, they are somewhat complex. Hence, as a guide to the reader, we set forth the principal corporations and individuals who figure in this litigation. Four corporations are involved, one of which, Quintel, is the issuer of the stock that is the subject of this litigation. Quintel, a nominal defendant-appellee in the appeal before us, is a publicly-traded Delaware corporation. The other three corporations are Psychic Reader's Network (Psychic), New Lauderdale, LLC, and Calling Card Co., Inc., each of which at one time played a more minor

role. Psychic is a closely-held Florida corporation providing psychic consultations to persons calling in by telephone. New Lauderdale is a limited liability Florida corporation (formed by Psychic and Quintel), which develops and markets theme-related clubs and telephone entertainment services. Calling Card is a subsidiary owned by Quintel. Quintel, through Calling Card, and Psychic each held 50 percent of the stock of New Lauderdale. Psychic and Quintel had joined forces to form New Lauderdale in 1995.

We turn now to the actors in the suit: Thomas H. Lindsey and Steven L. Feder each owned in equal proportion a total of 89 percent of the stock of Psychic. Feder was the chief executive officer (CEO) of Psychic. Stolz owned the remaining 11 percent of the common stock of Psychic. Quintel's CEO, Jeffrey Schwartz, proposed to Feder in 1995 that Quintel buy Psychic's 50–percent interest in New Lauderdale in exchange for Quintel stock. Feder agreed.

In September 1996 Psychic and Quintel executed a sales agreement ("Sales Agreement") to sell Psychic's interest in New Lauderdale to Quintel in exchange for the issuance of new shares of Quintel common stock to Psychic's shareholders. Pursuant to the Sales Agreement, Stolz received 352,000 shares of Quintel common stock (in proportion to his 11 percent interest in Psychic), and Feder and Lindsey each received 1,424,000 shares (which combined were in proportion to their 89 percent interest in Psychic). While Stolz owned less than 2.5 percent of the outstanding Quintel common stock, his stock holdings when added to those of Feder and Lindsey totaled over 18 percent.

The Sales Agreement included several "lock-up" provisions restricting the ability of Stolz, Feder, and Lindsey to dispose of their new Quintel shares. Aside from formally consenting to these specific provi-

sions, Stolz and Lindsey are said to have played no role in negotiating the Sales Agreement, which was handled by Schwartz for Quintel and by Feder for Psychic, with the help of Psychic's counsel, Donn A. Beloff. According to Feder, the lock-up provisions were included at Quintel's request because of its concern subsequent to its purchase of Psychic's interest in New Lauderdale that rapid sales of large blocks of Quintel stock could depress its price. Pursuant to § 3.3 of the Sales Agreement, therefore, the former Psychic shareholders were barred for two years from selling their Quintel stock, except to pay taxes or if a principal of Quintel sold shares. In addition, § 3.2 of the Sales Agreement limited the number of shares that could be sold in any three-month period and treated the three Psychic shareholders, within certain bounds, as "affiliates" within the meaning of Commission Rule 144(a)(1).

Psychic and Quintel also executed a number of ancillary agreements including a registration agreement, an escrow agreement governing the newly issued shares of Quintel common stock, and a covenant not to compete. Calling Card and Feder entered into an agreement by which Feder would perform managerial services for Calling Card and be able to serve as a director of either Calling Card or Quintel, if elected. In addition, Psychic, Quintel, and Calling Card executed a service agreement, pursuant to which Psychic would provide live operator services to Calling Card. The service agreement further acknowledged that Feder's continuing control of Psychic (he later bought out Lindsey's interest in that corporation) was an essential condition to Quintel's purchase of Psychic's interest in New Lauderdale.

In December 1996 Stolz, Feder, and Lindsey jointly executed and filed a Schedule 13D with the Commission reporting their acquisition of Quintel stock pursuant to the Sales Agreement. The Schedule reflected, by a check in the appropriate box, that Stolz was a member of a "group" under § 13(d) of the Exchange Act. The Schedule also indicated that a § 13(d) group "may be formed" which "may be deemed to be the beneficial owner" of the 18 percent of Quintel stock owned in the aggregate by the three joint filers. The Schedule stated that the sole purpose of the acquisition of Quintel stock was "for investment," and the Schedule explicitly disclaimed any beneficial ownership by Stolz, Feder, and Lindsey of each other's Quintel stock, except for certain shares owned by Feder and Lindsey as joint tenants. Four subsequent amendments to the Schedule contained similar disclaimers.

Further, between February 1997 and September 1998, Stolz filed one Form 5 and six Form 4s with the Commission. Each form stated that the "Relationship of [the] Reporting Person to [the] Issuer" was that of a "Member of [a] 13(d) group owning more than 10%." The cover letter accompanying each form similarly stated that Stolz was a member of a § 13(d) group owning more than ten percent of Quintel stock. According to Stolz, the Schedule 13D and the Forms 4 and 5 were prepared by his attorney, and he signed them without taking note of these particular statements.

Between November 1996 and August 1998, Stolz made 40 purchases and 51 sales of Quintel common stock. These transactions ranged anywhere from 100 to 26,300 shares, and averaged slightly less than 5,400 shares per transaction, which equals 1.5 percent of Stolz' personal holdings in Quintel. The other two Psychic shareholders, Feder and Lindsey, also sold small percentages of their Quintel stock on the open market, but made no purchases. On December 24, 1997 Stolz, Feder, and Lind-

sey transferred their respective Quintel shares to a short-term trust; each trust had the same terms and the same trustee. In April or May 1999, Quintel offered to redeem the Quintel stock it had issued to Stolz, Feder, and Lindsey. They accepted, and the redemption of their remaining Quintel stock took place on June 19, 1999.

On October 6, 1998 Richard Morales, a Quintel shareholder, brought this shareholder derivative suit pursuant to § 16(b) of the Exchange Act, 15 U.S.C. § 78p(b), to recover profits realized by Stolz through his short-swing trades in shares of Quintel common stock. Following limited discovery, the district court denied Morales' motion for summary judgment, and granted Stolz' cross-motion for the same relief on October 28, 1999. The trial court reasoned that since Stolz individually owned less than 2.5 percent of Quintel stock and was not a beneficial owner of the stock held by Feder and Lindsey, he fell below the ten-percent threshold required to trigger liability under § 16(b). *See Morales v. Quintel Entm't, Inc.*, 72 F.Supp.2d 344, 346–50 (S.D.N.Y.1999). Morales appealed. The Commission filed an *amicus curiae* brief.

## DISCUSSION

### I Standard of Review

On appeal from a grant of summary judgment we review the record *de novo* to determine whether genuine issues of material fact exist requiring a trial. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). A grant of summary judgment will be affirmed only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The same standard applies where, as here, the parties filed cross-motions for summary judgment and the district court granted one motion, but denied the other. *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir.2000). Moreover, even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993). Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration. *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir.1981).

### II Section 16(b)

With that standard in mind, we turn to the merits. Section 16(b) of the Exchange Act requires that any profits derived from short-swing trading be disgorged to the issuer of stock. Short-swing trading is defined as the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be "insiders," who are presumed to have access to confidential corporate information not generally available to other participants in the public market. *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir.1998). An "insider" is defined in the statute as a beneficial owner of more than ten percent of any class of the company's non-exempt, registered equity securities, or a director or officer of the company issuing the stock. 15 U.S.C. § 78p(a), (b).

The statute creates strict liability for insiders engaging in short-swing trading without regard to the trader's intent

and regardless also of whether the trading results in a profit or a loss. *Gwozdzinsky,* 156 F.3d at 308. The statute aims to deter insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock. *Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316, 320 (2d Cir.1998).

In the present case it is undisputed that Stolz sold and purchased Quintel common stock within a six-month period. And, it is also undisputed that he is neither an officer nor a director of Quintel, and that he never personally owned more than ten percent of Quintel common stock. Thus, the only issue we must resolve is whether Stolz was a "beneficial owner" of ten percent or more of Quintel common stock by reason of his association with Feder and Lindsey.

The Exchange Act does not define the term "beneficial owner" as it is used in § 16(b). Absent a statutory definition, a substantial body of case law developed over the years that filled in the deficiency, defining beneficial ownership by reference to whether the insider trading in company stock obtained a *direct* pecuniary benefit from the purchase and sale of the securities in question. *See generally Mayer v. Chesapeake Ins. Co.,* 877 F.2d 1154, 1158–62 (2d Cir.1989) (reviewing cases). Under this view, indirect pecuniary benefit, even when accompanied by voting control, generally was considered insufficient to cast an insider as a beneficial owner of the securities for purposes of § 16(b). *Id.* at 1162. In 1991 the Commission promulgated Rule 16a–1, which substantially altered this body of case law by creating a two-tiered analysis of beneficial ownership. *See generally Feder v. Frost,* 220 F.3d 29, 32–34 (2d Cir.2000) (citing Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange

Act Release No. 34–28869, 56 Fed. Reg. 7242 (Feb. 21, 1991)).

First, solely for purposes of determining insider status as a ten-percent holder, the regulations state that "the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the [Exchange] Act and the rules thereunder." 17 C.F.R. § 240.16a–1(a)(1) (2000). Second, for purposes of determining what transactions must be reported under § 16, the regulations specify that "the term *beneficial owner* shall mean any person who, directly or indirectly, . . . has or shares a direct or indirect pecuniary interest in the equity securities" so traded. *Id.* § 240.16a–1(a)(2).

In the case at hand, Stolz has conceded the question of pecuniary interest. *Morales,* 72 F.Supp.2d at 347. As a result, our analysis is confined to beneficial ownership under § 13(d) of the Exchange Act. Although we have upheld Rule 16a–1(a) as an exercise of the Commission's rulemaking authority, the new reference to § 13(d) represents a significant departure from prior decisional law because § 13(d) focuses on control, not on pecuniary benefits. *Feder,* 220 F.3d at 35–36 (discussing change from prior law under *Mayer,* 877 F.2d 1154). Because this new definition of beneficial ownership has not been fully tested in the circuit courts, it is appropriate for us to examine § 13(d) in some detail.

### III Section 13(d)

In response to hostile corporate takeovers in the 1960s, Congress in 1968 enacted § 13(d) as part of the Williams Act. *See* Act of July 29, 1968, Pub. L. No. 90–439, § 2, 82 Stat. 454. Its purpose was to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in

corporate control." *GAF Corp. v. Milstein,* 453 F.2d 709, 717 (2d Cir.1971); *accord SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1167 (D.C.Cir.1978). By requiring the disclosure of information by a potential takeover bidder, the Act strikes a careful balance among the interests of the bidder, the incumbent management in defending against such bid by explaining its position, and the shareholders so that they can evaluate the bidders' intentions in deciding whether to throw in their lot with them. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58–59, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 55 (2d Cir.1985).

Specifically, § 13(d) requires any person acquiring beneficial ownership of five percent or more of a corporation's common stock to disclose within ten days of the acquisition certain information to the corporation, the Commission, and the exchanges on which the stock is traded. 15 U.S.C. § 78m(d)(1)(D) (1994); *Mayer,* 877 F.2d at 1162. That information includes: the issuer and class of the securities acquired, the identity and background of the acquiring persons, the source and amount of funds used to make the purchases, the purpose of the acquisition, including any purpose to gain control of the issuer, the number of shares beneficially owned, and the nature of the relationship between any persons acquiring securities as a group. 15 U.S.C. § 78m(d)(1)(A)-(E); 17 C.F.R. § 240.13d 101 (2000) (Schedule 13D).

### A. *Section 13(d) "Group"*

 As this last item suggests, § 13(d) encompasses not only the isolated shareholder who accumulates shares of a corporation's common stock, but also a group of shareholders who undertake the same activity as part of a collective effort. In this vein, subsection (d)(3) states that "[w]hen two or more persons act as a . . .

group for the purpose of acquiring, holding, or disposing of securities of an issuer, such . . . group shall be deemed a 'person' for the purposes of this subsection." 15 U.S.C. § 78m(d)(3). The legislative history confirms that the purpose of the provision was to prevent evasion of the disclosure requirement:

> "This provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than . . . [5] percent of a class of securities at the time they agreed to act in concert. . . . This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership by reason of any contract, understanding, relationship, agreement or other arrangement."

*Wellman v. Dickinson,* 682 F.2d 355, 366 (2d Cir.1982) (quoting S.Rep. No. 90–550, at 8 (1967); H.R. Rep. No. 90–1711, at 8–9 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2811, 2818) (emphasis removed) (alteration in original).

To implement § 13(d)(3), the Commission promulgated Rule 13d–5, which defines beneficial ownership by a "group" as follows:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the [Exchange] Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d–5(b)(1) (2000); *cf. id.* § 240.13d–3 (2000) (defining beneficial ownership by individuals outside the "group" context). Thus, the key inquiry in

the present case is whether Stolz, Feder, and Lindsey "agree[d] to act together for the purpose of acquiring, holding, voting or disposing of" Quintel common stock. 17 C.F.R. § 240.13d–5(b)(1); *see Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir.1973) ("[A]bsent an agreement between them a 'group' would not exist."). Only if the answer is in the affirmative may Stolz be deemed a beneficial owner of more than ten percent of Quintel common stock for purposes of § 16(b) liability.

 Whether the requisite agreement exists is a question of fact. *See Savoy Indus.*, 587 F.2d at 1163; *Corenco Corp.*, 488 F.2d at 218; *Bath Indus., Inc. v. Blot*, 427 F.2d 97, 111 (7th Cir.1970). The agreement may be formal or informal and may be proved by direct or circumstantial evidence. *Wellman*, 682 F.2d at 363; *Savoy Indus.*, 587 F.2d at 1163. Moreover, the alleged group members need not be committed to "acquiring, holding, voting, or disposing of equity securities" on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities. *Morales v. Freund*, 163 F.3d 763, 767 n. 5 (2d Cir.1999); *Wellman*, 682 F.2d at 363; *Bath Indus.*, 427 F.2d at 111. In short, we must examine the record to determine whether sufficient evidence supports an inference that such an agreement or understanding exists. *Wellman*, 682 F.2d at 363; *Savoy Indus.*, 587 F.2d at 1163.

### B. *Existence of an Agreement*

 In ruling on Stolz' summary judgment motion, the district court found the evidence insufficient to infer the existence of any such agreement among Stolz, Feder, and Lindsey. The court reasoned in large part that there was no evidence the three Psychic shareholders agreed to seek corporate control or to exert influence over Quintel; that the purpose of the Sales Agreement was not to acquire Quintel common stock but instead to sell Psychic's holdings in New Lauderdale; and that the lock-up provisions were included in the Sales Agreement solely on the insistence of Quintel for the protection of its own shareholders. *Morales*, 72 F.Supp.2d at 348–49. With respect for the experienced district court judge, we nonetheless believe a rational trier of fact could conclude otherwise based upon the record evidence.

### 1. *Control Purpose*

As an initial matter, the SEC (as amicus) points out that "[t]he district court's extensive reliance on the absence of a control purpose has caused its opinion to be interpreted as holding that a Section 13(d) group may exist only where the group seeks corporate control or to influence corporate control," and therefore urges us to clarify that a control purpose is not necessary to trigger Section 13(d). However, we read the district court's comments on this point as observations about trends in the cases, rather than as a holding that a control purpose is essential. The district court discussed only cases involving some kind of control objective, but did not state that it had identified the universe of cases in which group formation could be found.

 In any event, we agree with the SEC that the agreement required by § 13(d)(3) need not be an agreement to gain corporate control or to influence corporate affairs. *See Mosinee Paper Corp. v. Rondeau*, 500 F.2d 1011, 1015–16 (7th Cir.1974), *rev'd on other grounds*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). The plain language of § 13(d)(3) demands only an agreement "for the purpose of acquiring, holding, or disposing of securities," 15 U.S.C. § 78m(d)(3), and Rule 13d–5 is similarly satisfied by that sort of

agreement, 17 C.F.R. § 240.13d–5(b)(1). Neither provision mandates that the narrow object of acquiring, holding, voting, or disposing of securities must itself serve a broader purpose of seeking corporate control or otherwise exerting influence over corporate affairs.

To the contrary, § 13(d)(1)(C) requires the disclosure of any purpose to acquire corporate control, 15 U.S.C. § 78m(d)(1)(C), and § 13(d)(6)(D) empowers the Commission to grant exemptions for acquisitions of securities "not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer," *id.* § 78m(d)(6)(D). If a purpose to acquire corporate control were a precondition to the existence of a § 13(d) group, these other provisions would be largely superfluous. Again, as noted above, the function of § 13(d) is to alert the market to large acquisitions that threaten *"potential* shift[s] in corporate control." *GAF Corp.,* 453 F.2d at 717 (emphasis added). Requiring an *actual* control purpose would disserve this function insofar as it would prevent shareholders from revaluing their holdings, and hinder incumbent management from adopting an appropriate strategy, in advance of an actual takeover attempt. *Mosinee Paper Corp.,* 500 F.2d at 1016.

## 2. *The Sales Agreement*

We part ways from the district court in evaluating the existence of the Sales Agreement as a basis for inferring an agreed purpose to acquire securities. In this context, the district court observed that "the purpose of the [Sales] [A]greement was not to acquire control of Quintel," but rather "[t]he only common objective that Stolz, Feder and Lindsey shared was to sell [Psychic's] holdings in New Lauderdale LLC." *Morales,* 72 F.Supp.2d at 348.

But reasoning in this fashion is like insisting that the purpose of the Agreement is six of one, rather than half-a-dozen of the other. Except for a gift, virtually any acquisition of securities involves the exchange of some consideration in return for the receipt of securities. Hence, in the ordinary case, the existence of such an exchange supports the inference that the acquisition of the securities—and not simply the sale of the consideration—was the intended purpose of the exchange. *See* 17 C.F.R. § 240.13d–5(a) ("A person who becomes a beneficial owner of securities shall be deemed to have acquired such securities for purposes of section 13(d)(1) of the Act, *whether such acquisition was through purchase or otherwise."*) (emphasis added).

Stolz argues that this is not an ordinary case. In particular, he points to his status as a minority shareholder in Psychic and to his lack of any role in negotiating the Sales Agreement, as well as to his own sworn statement and one by Feder that the Psychic shareholders never "agreed" among themselves to acquire Quintel common stock. But Stolz' status as a minority shareholder must be viewed in light of Psychic's status as a closely-held corporation, with only Feder and Lindsey as co-shareholders. Similarly, Stolz' lack of any negotiating role must be viewed in light of the formal, signed agreement of all three Psychic shareholders to the lock-up provisions. And a finder of fact may attach significance to the fact that, at the time of the closing of the 1996 Agreement, Feder executed an employment agreement providing that he may serve as a director of Quintel, a role he later in fact performed. Taking these facts in context, a reasonable trier of fact could discredit the two cited sworn statements and infer instead that Stolz, Feder, and Lindsey were in communication with one another, were aware of the provisions of the Sales Agreement, and

entered into the Sales Agreement with an agreed purpose to acquire Quintel common stock. Thus, this is not a case in which the assertion of existing shareholder rights or a mere business relationship is alleged as a basis for group membership. *See Portsmouth Square, Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 871–73 (9th Cir. 1985) (shareholder litigation to void issuance of new stock); *Transcon Lines v. A.G. Becker Inc.*, 470 F.Supp. 356, 375 (S.D.N.Y.1979) (investment consulting relationship).

As a consequence, we conclude that, looking at all the facts and circumstances in the light most favorable to Morales as the nonmoving party on Stolz' cross-motion, a rational trier of fact could find that Stolz, Feder, and Lindsey "agree[d] to act together for the purpose of acquiring" Quintel common stock. 17 C.F.R. § 240.13d–5(b)(1); *see Morales v. New Valley Corp.*, 999 F.Supp. 470, 475–76 (S.D.N.Y.1998) (granting summary judgment to plaintiff where existence of written agreement evidenced agreed purposes to hold and to dispose of securities), *aff'd sub nom. Morales v. Freund,* 163 F.3d 763 (2d Cir.1999).

### 3. *The Lock-up Provisions*

Stolz nonetheless contends he may not be held liable under § 16(b) unless the alleged agreement to a common purpose continued to exist (and thus continued to render him a ten-percent beneficial owner) at the time of his subsequent purchases and sales of Quintel stock. Although the Sales Agreement was executed in September 1996, Stolz' first such purchase of Quintel common stock took place on November 15, 1996, and his first sale was not executed until June 18, 1997. Under Stolz' theory, liability would not attach unless an agreement to engage in concerted activity

could be found to exist at least as late as June 1997.

This theory of liability finds support in the plain language of § 16(b) stating that "[t]his subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved...." 15 U.S.C. § 78p(b); *accord* 17 C.F.R. § 240.16a–2(c) (2000) ("A ten percent beneficial owner not otherwise subject to section 16 of the Act must report only those transactions conducted while the beneficial owner of more than ten percent of a class of equity securities of the issuer."); *see also Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 234–35, 249–50, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (no § 16(b) liability for purchase that took defendant above ten-percent threshold, unless defendant already ten percent owner prior to purchase); *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 419–20, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) (no § 16(b) liability for second sale of stock where first sale took defendant's holdings below ten-percent threshold).

Even accepting this limitation on liability, a number of facts suggest that an agreement to a common purpose continued into June 1997, when Stolz made his first sale, and even into August 1998, when he made his last purchase of Quintel common stock. For example, the lock-up provisions in the Sales Agreement, viewed in light of the other facts, suggest that Feder, Lindsey, and Stolz reached a mutual agreement with respect to holding and disposing of shares of Quintel common stock. The district court concluded otherwise, reasoning that the provisions were imposed involuntarily at the insistence of Quintel, and that the individual Quintel holdings of the Psychic shareholders were sufficiently small to dispel any real threat

of corporate control or influence. *See Morales*, 72 F.Supp.2d at 348–49.

But regardless of whether Quintel insisted on the lock-up provisions, the undisputed fact remains that Feder, Lindsey, and Stolz each agreed to those provisions, and those provisions directly governed the holding and disposing of Quintel common stock. *See New Valley Corp.*, 999 F.Supp. at 475–76 (provisions regarding right of first refusal and right to share of appreciation evidenced agreement with respect to holding and disposing of securities, even though rights operated to benefit of only one party). Moreover, although their individual holdings were relatively small, it would be reasonable to infer that a company in Quintel's position would perceive the three Psychic shareholders as a single unit; and it is undisputed that their aggregate holdings were large enough to trigger the statutory presumptions that they not only enjoyed access to inside information, but also posed a possible threat to corporate control. *See Strauss v. Am. Holdings, Inc.*, 902 F.Supp. 475, 479–80 (S.D.N.Y.1995) (complaint adequately stated § 13(d) claim based on group beneficial ownership where allegations supported inference that same individual controlled investments by separate corporation and partnership).

As a result, the lock-up provisions in the Sales Agreement—all of which remained in effect for at least two years—may bear upon the continued existence of a concerted agreement among the Psychic shareholders with respect to holding and disposing of Quintel common stock. But we need not decide and do not purport to decide whether such lock-up provisions, considered in isolation, would suffice to establish such an agreement, since other evidence in the record also supports this conclusion.

■ This additional evidence includes statements filed with the SEC that all three Psychic shareholders deposited their Quintel holdings on December 24, 1997, in identical trusts all naming the same person as trustee, as well as evidence that Quintel redeemed the holdings of all three shareholders together on June 19, 1999. Such evidence of coordinated action may indicate the existence of a group, even in the absence of a formal agreement. *See, e.g., Lerner v. Millenco, L.P.*, 23 F.Supp.2d 337, 343–44 (S.D.N.Y.1998). Although Stolz' trades in Quintel stock do not appear to have been coordinated with those of Feder and Lindsey, this fact alone will not defeat a claim where the trades are relatively small in proportion to the party's holdings and do not plainly frustrate the purported purposes of the agreement. *See New Valley Corp.*, 999 F.Supp. at 475 (on summary judgment motion, evidence that group members "might not always make identical investment decisions" did not preclude existence of agreement); *Strauss*, 902 F.Supp. at 480–81 n. 5 (on motion to dismiss, evidence of "inconsisten[t] ... trading patterns" did not preclude existence of agreement). Moreover, a finder of fact could determine that the formation of identical trusts in 1997 and the investors' joint redemption in 1999 shed light backwards in time on the unity of purpose of the investors in 1996, when they entered into a lock-up agreement with Quintel.

### 4. *Ruling on This Appeal*

In sum, we conclude that viewing all of the facts and circumstances in the light most favorable to Morales as the nonmoving party on Stolz' cross-motion, a rational trier of fact could find that Stolz, Feder, and Lindsey "agree[d] to act together for the purpose of acquiring, holding, ... or disposing of" Quintel common stock from September 1996 through August 1998. 17 C.F.R. § 240.13d–5(b)(1). We also realize

that a trier of fact could reason as did the district court judge, credit the sworn statements by Stolz and Feder, and find that the three Psychic shareholders did not combine to pursue a common objective with respect to one of the statutory activities. *See Freund,* 163 F.3d at 767 n. 5. Thus, although the district court properly denied Morales' motion for summary judgment, granting that relief to Stolz on his cross-motion was improper.

The decision of the First Circuit in *Gen. Aircraft Corp. v. Lampert,* 556 F.2d 90 (1st Cir.1977), supports our result. In *General Aircraft* the First Circuit also faced the question whether the acquisition by three individuals of common stock in a publicly-traded corporation gave rise to group beneficial ownership for purposes of § 13(d). *Id.* at 91–92, 95. The district court granted a preliminary injunction against a proxy contest launched by the three individuals against the corporate management, based on allegedly inadequate and untimely disclosures in the Schedule 13D they had filed jointly. *Id.* at 93. When the three shareholders appealed the injunction, the First Circuit affirmed in part, citing the following evidence in support of their status as a § 13(d) group:

> the 150,485 shares of . . . common stock were acquired simultaneously in identical transactions (except for amount) by all three appellants; [one person's] shares were held in [another's] name from the time of purchase; a single Schedule 13D was filed on behalf of all three appellants and signed by all three; copies of correspondence with [the corporation] from any one appellant were sent to the others.

*Id.* at 95. On this record, the First Circuit ruled, "the District Court could not have concluded other than that the three appellants constituted a 'group' and thus, as a

'person,' were subject to the provisions of Section 13(d)." *Id.*

In a number of respects, the evidence in *General Aircraft* is similar to the evidence in the instant case, including the simultaneous acquisition of stock and the joint filing of a single Schedule 13D. Although *General Aircraft* did rely on evidence not present here, such as copies of correspondence by the three shareholders, the present record also contains additional evidence not present in *General Aircraft,* like the three individuals together owning a closely-held corporation (*i.e.,* Psychic), the formal agreement to the lock-up provisions, the simultaneous deposit of shares into trusts, and the simultaneous redemption of stock by Quintel. Hence, *General Aircraft* plainly supports our view that a rational trier of fact could find the requisite agreement by Stolz, Feder, and Lindsey establishing beneficial ownership as a group under § 13(d).

Stolz maintains that even if such a result is justified under § 13(d), imposing liability for short-swing trades on these facts constitutes an unwarranted extension of strict liability under § 16(b). *See Foremost–McKesson,* 423 U.S. at 252, 96 S.Ct. 508 (because § 16(b) imposes strict liability, doubts about statute's construction should be resolved against expanding liability); *see also* Peter J. Romeo & Alan L. Dye, *Developments Under Section 16,* SF05 A.L.I.–A.B.A. Continuing Legal Educ. 1079, 1085–86 (2000) (describing the new definition of § 16(b) beneficial ownership as "controversial"); Park McGinty, *Replacing Hostile Takeovers,* 144 U. Pa. L. Rev. 983, 1059–60 (1996) ("overbroad"); John C. Coffee, Jr., *The SEC and the Institutional Investor: A Half–Time Report,* 15 Cardozo L. Rev. 837, 877–81 (1994) ("overreach[ing]"). But, as discussed earlier, the grafting of the § 13(d) standards for beneficial ownership onto § 16(b)

is a product not of any decision of this Court, but rather of the regulations promulgated by the Commission in 1991.

Stolz does not challenge the authority of the Commission to issue those regulations, and even if he did, such a challenge might well be foreclosed by our approval of those regulations in *Feder,* 220 F.3d at 35–36. Moreover, the Commission as *amicus curiae* has expressly declined to take a position on whether the imposition of liability is proper under the facts of this case. In the final analysis, the Commission possesses adequate authority to issue appropriate regulations addressing any unforeseen consequences of its new definition of beneficial ownership under § 16(b). *See, e.g.,* 17 C.F.R. § 240.13d–5(b)(2) (exempting certain acquisitions by institutional investors in the ordinary course of business and in the absence of any control purpose or other agreement); *id.* § 240.16a–1(a)(1)(i)(xi) (excluding various other persons and institutions).

### 5. *Remaining Contentions*

■ Morales challenges two other aspects of the district court's decision, which we address only briefly. First, he contests the trial court's reliance on an interpretive letter from the Commission for the proposition that § 13(d) does not apply to the involuntary acquisition of securities by multiple persons who pose no collective threat of control. *See Morales,* 72 F.Supp.2d at 349 (citing *Goldman Sachs Group, Inc.,* SEC No Action Letter [1999 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,553 (Apr. 30, 1999)). Although such a letter lacks any binding precedential force on the federal courts, it was not error for the district court to rely on the letter for whatever persuasive value it may have had. *See New York City Employees' Ret. Sys. v. SEC,* 45 F.3d 7, 12–13 (2d Cir.1995). But this particular letter is inapposite on

its facts, since it addressed an agreement to convert interests in a private partnership to stock in a publicly-traded corporation, and the agreement was imposed on over 500 persons essentially as a condition of employment.

■ Second, Morales argues the district court erred in ruling that the Schedule 13D and Forms 4 and 5 filed by Stolz did not constitute admissions of membership in a § 13(d) group. *See Morales,* 72 F.Supp.2d at 349. Yet, regulations promulgated by the Commission provide that "[a]ny person may expressly declare in any statement filed that the filing of such statement shall not be construed as an admission that such person is, for the purposes of sections 13(d) or 13(g) of the [Exchange] Act, the beneficial owner of any securities covered by the statement." 17 C.F.R. § 240.13d–4 (2000). In the present case, it is undisputed that Stolz explicitly disclaimed beneficial ownership in the text of the Schedule 13D he filed with the SEC. His failure to include similar disclaimers in his Forms 4 and 5 cannot fairly be said to be persuasive in resolving the question of statutory interpretation with respect to § 16(b) liability. *Chem. Fund, Inc. v. Xerox Corp.,* 377 F.2d 107, 112 (2d Cir.1967); *Levner v. Saud,* 903 F.Supp. 452, 461 n. 14 (S.D.N.Y.1994), *aff'd sub nom. Levner v. Prince Alwaleed,* 61 F.3d 8 (2d Cir.1995). As a consequence, we think the district court correctly ruled on this point.

### CONCLUSION

Accordingly, for the reasons set forth above, the judgment of the district court is hereby affirmed in part, to the extent it denied Morales' motion for summary judgment, and vacated in part, to the extent it granted Stolz' cross-motion for summary judgment. The action is remanded to the

district court for further proceedings not inconsistent with this opinion.