# In the
# United States Court of Appeals
## For the Second Circuit

————————————————

August Term 2019

No. 19-560-cv

————————————————

AARON RUBENSTEIN,

*Plaintiff-Appellant,*

v.

INTERNATIONAL VALUE ADVISERS, LLC, CHARLES DE VAULX, CHARLES DE LARDEMELLE,

*Defendants-Appellees,*

ADTALEM GLOBAL EDUCATION SERVICES (F/K/A DEVRY EDUCATION GROUP, INC.),

*Nominal Defendant-Appellee,*

JOHN DOE, AN UNIDENTIFIED IVA CLIENT,

*Defendant.†*

————————————————

Appeal from the United States District Court
for the Southern District of New York
No. 18-cv-81,
Paul A. Engelmayer, District Judge, Presiding.
(Argued October 23, 2019; Decided May 20, 2020)

---

† The Clerk of Court is directed to modify the caption to conform to the above.

Before:       KEARSE, PARKER, and SULLIVAN, *Circuit Judges*.

Plaintiff-Appellant Aaron Rubenstein appeals from an order of the United States District Court for the Southern District of New York (Engelmayer, *J.*) dismissing his complaint under Section 16(b) of the Securities Exchange Act for failure to state a claim. We hold that an investment management agreement delegating discretionary investment authority to an investment advisor is not an agreement to trade in the securities of an issuer and, therefore, is not a standalone basis for membership in an insider group. Moreover, we hold that such an investment advisor's client does not become an insider group member simply because the advisor has filed a Schedule 13D or deputized a director on an issuer's board. Consequently, clients who have not entered an issuer-specific trading agreement are not liable for disgorgement of short-swing profits solely by virtue of their investment advisor's insider status.

**AFFIRMED.**

MIRIAM TAUBER (David Lopez, Law Office of David Lopez, Southampton, NY, *on the brief*), Miriam Tauber Law PLLC, New York, NY, *for Plaintiff-Appellant*.

DENNIS HENRY TRACEY, III (Robin Muir, *on the brief*), Hogan Lovells US LLP, New York, NY, *for Defendants-Appellees*.

SUSAN SALTZSTEIN, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Nominal Defendant-Appellee*.

BARRINGTON D. PARKER, *Circuit Judge*:

Plaintiff-Appellant Aaron Rubenstein appeals from an order of the United States District Court for the Southern District of New York (Engelmayer, *J.*) dismissing, under Rule 12(b)(6), his complaint alleging violations of Section 16(b) of the Securities Exchange Act of 1934 (the "'34 Act"). The issue presented is whether a client of an investment advisor became a member of a Section 13(d) group with his investment advisor and the advisor's other clients merely because he and the other clients had delegated discretionary investment authority to the advisor and the advisor had purchased for the client's account shares of the same issuer that was the subject of the advisor's Schedule 13D filing. We agree with the court below that the client did not thereby become a member of a group and that the client was not obliged to disgorge his short-swing profits. Accordingly, we affirm the order of the district court.

To prevent insiders of a securities issuer from trading on material non-public information, Section 16(b) of the Securities Exchange Act of 1934 imposes strict liability on certain insiders of an issuer, requiring them to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities. As defined by Section 16(b), short-swing trading is "any purchase and sale, or

any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . irrespective of any intention on the part of [the insider]." 15 U.S.C. § 78p(b). Among the insiders subject to the rule are directors and officers of the issuer, as well as "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer. *Id.*[1] Section 16(b) is known as the "short-swing profit rule."

In addition to requiring individual statutory insiders to disgorge short-swing profits, the '34 Act provides for "group" liability. Section 13(d)(3) provides that "[w]hen two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer," the group shall be deemed a

---

[1] The definition of "beneficial owner" under the statute is somewhat involved. First, Section 13(d) defines a "beneficial owner" as "any person who . . . has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, [a] security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, [a] security." 17 C.F.R. § 240.13d-3(a). With certain exceptions, this definition is employed to determine who qualifies as a statutory insider subject to the short-swing profit rule. *Id.* § 240.16a-1(a)(1). Next, Section 16(b) narrows the class of transactions subject to the rule by defining "beneficial owner" as "any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities." *Id.* § 240.16a-1(a)(2). A pecuniary interest is an "opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities," *id.* § 240.16a-1(a)(2)(i), and may include a "performance-related fee, other than an asset-based fee, received by . . . [an] investment manager," *id.* § 240.16a-1(a)(2)(ii)(C).

"person" subject to Section 16(b). *Id.* § 78m(d)(3).[2] A group is formed "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). The group is then "deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any [group members]." *Id.* Consequently, if members of a group collectively hold more than 10% of any class of equity securities of an issuer, each member of the group is subject to the short-swing profit rule. *See id.* § 240.16a-1(a)(3). The dispositive issue on this appeal is whether John Doe, an anonymous defendant, became a member of such a group.

Defendant International Value Advisers ("IVA") is an investment advisor registered under Section 203 of the Investment Advisers Act of 1940. Defendants Charles de Vaulx and Charles de Lardemelle are the managing members of IVA, as well as portfolio managers for IVA-managed funds and separately managed client accounts. Rubenstein holds shares in AdTalem Global Education Services, formerly known as DeVry Education Group ("DeVry"). The "John Doe" defendant is the owner of a brokerage trading account managed by IVA, and

---

[2] *See also* 17 C.F.R. § 240.16a-1(a)(1) (applying the preceding definition, drawn from Section 13(d), for purposes of Section 16(b) liability).

IVA exercises discretionary authority over that account. That account holds shares of DeVry selected and purchased for it by IVA acting as its investment manager. Although that account does not hold more than 10% of DeVry shares, John Doe, the IVA defendants, and IVA's other clients collectively owned 19.5% of DeVry's outstanding common stock.

Between June and December 2016, the IVA defendants reported on ownership reports filed under Section 13(d) and Section 16(a) of the '34 Act that they beneficially owned, through their voting and investment power over their advisee-clients, more than 10% of DeVry's outstanding common stock. Specifically, at various times in 2016, the IVA defendants filed Schedule 13Ds with the SEC indicating that, in accumulating their position in DeVry, they had formed a "control purpose" with respect to DeVry and that they sought the appointment of IVA's managing partner to the DeVry board to represent the investment interests of IVA and its clients who held DeVry shares.

No one disputes that, at this point, the IVA defendants were subject to Section 16(b)'s short-swing profit rule. In July 2016, IVA, as investment manager for John Doe's account, purchased 31,847 shares of DeVry and within six months sold DeVry shares at a profit. If John Doe were a member of a group with the

IVA defendants and their other clients, he would have been a statutory insider subject to the short-swing profit rule because the IVA defendants were insiders and their clients collectively owned more than 10% of DeVry common stock. If not, he would not have been subject to the rule. Accordingly, what the parties contest is whether John Doe was a member of an insider group with IVA and its clients and consequently obligated to return the short-swing profits.

Rubenstein sued, alleging that John Doe was a member of a group with the IVA defendants and IVA's other clients. He contended that John Doe's investment management agreement with IVA qualified as an agreement to trade in the securities of an issuer under Section 13(d). He further theorized that the IVA defendants' filing of a Schedule 13D automatically caused John Doe to become a member of a group by "silent acquiescence." In other words, Rubenstein alleged that the filing of the Schedule 13D put an owner of DeVry shares in a managed account (such as John Doe) on notice of the IVA defendants' control purpose and that the owner thereby "agreed" to become part of the group by failing to terminate the IVA defendants' control of the managed account.

Defendants moved to dismiss the complaint and the district court granted the motion. The court observed that the touchstone of a group under Section 13(d) is that its members combined in furtherance of a common objective. The court held that the complaint did not plausibly allege a common objective between the IVA defendants, who had a control purpose, and John Doe, whose DeVry shares had been purchased for his account on a discretionary basis by his investment manager. In other words, the court held that Rubenstein had not plausibly pled the existence of a Section 13(d) agreement. *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 394-95 (S.D.N.Y. 2019).

The court further concluded that the applicable Section 13(d) rule, in addition to requiring an agreement, required its members to have acted together for the purpose of acquiring not just any security but the securities of "an issuer," meaning a particular issuer. Because the complaint did not plausibly allege that this had occurred, the court determined that John Doe did not become a member of a 13(d) group and could not be required to return his DeVry profits. *Id.* at 392.

This appeal followed. "We review a district court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12

(2d Cir. 2019); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

**DISCUSSION**

Resolution of this appeal turns on whether John Doe was a member of an insider group. We hold that he was not. Our holding follows from the text and structure of the '34 Act and its implementing regulations, as well as the legislative purpose behind the short-swing profit rule. Moreover, we are unmoved by Rubenstein's arguments to the contrary, which are based either on a misunderstanding of certain regulatory exemptions or on erroneous legal positions.

I.

A Section 13(d) group is formed "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). The group is then deemed to have acquired beneficial ownership of all equity securities of that issuer beneficially owned by any group members. If the group's collective holdings exceed 10% of any class of the issuer's outstanding equity securities, then each group member is subject to the short-swing profit rule. *See id.* § 240.16a-1(a)(3).

Rubenstein does not allege that any defendants are liable for short-swing profits except John Doe, who realized the profits in an account managed for him by IVA. It is not disputed that the other defendants were statutory insiders who would have been obligated to return short-swing profits had they realized them. They were required to file, and did file, Schedule 13Ds.

Rubenstein relies principally on the theory that IVA's clients became members of a group with their investment advisor and its other clients when they signed investment management agreements delegating discretionary trading authority to IVA. We do not agree. Rubenstein's theory is incompatible with the text of the '34 Act and its implementing regulations. Both provide that a group is formed when multiple individuals agree to act together "for the purpose of acquiring, holding, or disposing of securities *of an issuer*." 15 U.S.C. § 78m(d)(3) (emphasis added); *see also* 17 C.F.R. § 240.13d-5(b)(1). The regulations then deem the group members "to have acquired beneficial ownership . . . of all equity securities *of that issuer* beneficially owned by any [group members]." 17 C.F.R. § 240.13d-5(b)(1) (emphasis added).

We straightforwardly conclude that these provisions impose liability only when insiders enter an agreement, as defined in 17 C.F.R. § 13d-5(b)(1), to trade

the securities of a particular issuer. In *American Standard, Inc. v. Crane Co.*, we said that because Section 16(b) "speaks of 'such issuer' in the singular," there is "no room for a grammatical construction that would convert the singular into a plural." 510 F.2d 1043, 1058 (2d Cir. 1974); *see also Roth v. Jennings*, 489 F.3d 499, 510-12 (2d Cir. 2007); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 125-26 (2d Cir. 2001); *Morales v. Freund*, 163 F.3d 763, 767 (2d Cir. 1999).

Rubenstein does not allege the existence of any such agreement. He admits that the only agreement between the IVA defendants and John Doe is an investment management agreement under which John Doe gave the IVA defendants discretionary authority to trade securities in his account and agreed to pay them a fee for these services. Neither DeVry nor any other issuer was identified as one whose stock IVA might purchase for John Doe's account. In addition, the investment management agreement did not address whether, or to what extent, the IVA defendants might purchase or sell the same securities for the other accounts they managed; nor did the investment management agreement touch on the subject of whether the IVA defendants might seek to influence or control an issuer whose shares might be in an account they managed. Consequently, Rubenstein is simply wrong when he contends that the

investment management agreement constituted an "agreement" to trade in DeVry securities under Section 13(d) and 17 C.F.R. § 240.13d-5(b)(1).

An investment advisory client does not form a group with its investment advisor by merely entering into an investment advisory relationship. Nor does an investor become a member of a group solely because his or her advisor caused other (or all) of its clients to invest in securities of the same issuer. And Rubenstein points us to nothing else that might constitute an "agreement" or demonstrate a "common objective" to trade in the securities of "an issuer."

## II.

In addition to its incompatibility with the text of the statutes and rules, Rubenstein's interpretation does not serve the purpose of the statute, which is designed to "prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities." H.R. Rep. No. 90-1711 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2811, 2818; *see also Quintel*, 249 F.3d at 123 ("[T]he purpose of the provision was to prevent evasion of the disclosure requirement."). Rubenstein has never alleged that IVA's clients sought to pool their shares to evade the requirements of the statute. *See generally*

*Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998) (holding that courts should evaluate short-swing transactions pragmatically to determine whether they serve as a "vehicle for the evil which Congress sought to prevent" (quoting *Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 (1973))).

Nonetheless, Rubenstein offers a variety of policy arguments in support of his position, none of which persuades us. For example, he contends that our holding will facilitate illicit insider trading. Section 16(b) is designed to prevent abuse of inside information by prohibiting a narrow class of trades that Congress viewed as particularly likely to be based on such information. Rubenstein voices the concern that our holding will enable investment managers to evade Section 16(b) and to abuse inside information by trading in client funds rather than their own funds because client funds may not be subject to disgorgement. He argues that if clients are not members of a group with their advisor, then their advisor will be able to trade its clients' shares using inside information and to earn profits from those trades.

Because of the strict liability imposed by Section 16(b), the Supreme Court has cautioned against exceeding the "narrowly drawn limits" on the class of

corporate insiders who may be subject to the statute. *Gollust v. Mendell*, 501 U.S.

115, 122 (1991) (quoting *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232,

251 (1976)); *accord Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 427 (1972).

Accordingly, we may not expand the boundaries of the statute merely to address

Rubenstein's concerns.

In any case, Congress has chosen to address Rubenstein's concerns in other

ways. Exempting certain client profits from Section 16(b) does not insulate

investment advisors from liability under the more general anti-fraud provisions

of the '34 Act: Section 10(b) and Rule 10b-5. If IVA had improperly used inside

information to trade in its clients' accounts, it could be subject to Rule 10b-5,

regardless of whether its clients were part of an insider group. Section 16(b)

addresses only a narrow class of potential insider trading. By contrast, Rule 10b-5

addresses a broader sphere, including the insider trading that Rubenstein asks

Section 16(b) to police. Trading that passes muster under Section 16(b) may not

do so under Rule 10b-5. Rubenstein's fear that our holding will offer a safe

harbor to investment managers engaged in insider trading is consequently

unwarranted. Suffice it to say that his complaint contains no allegations that Rule

10b-5 has been violated, and that provision plays no part in our resolution of this case.

Rubenstein next complains that our holding will undermine Section 13(d)'s disclosure requirement.[3] Section 13(d) requires persons who are the beneficial owners of more than 5% of a company's shares to file a disclosure statement with the SEC. 15 U.S.C. § 78m(d). The requirement is designed to alert investors when shareholders acquire potentially controlling interests in corporations. Rubenstein argues that our holding will enable investment advisors to exercise control over companies without disclosing their interests if they distribute shares among their clients' accounts such that the advisors' own holdings never reach the 5% threshold.

However, this argument overlooks the fact that investment advisors may qualify as beneficial owners of shares in their clients' accounts, for purposes of Section 13(d), regardless of whether they form an insider group with their clients. When their clients' holdings in a security collectively reach the 5% threshold, the advisors may be subject to Section 13(d)'s reporting requirements. This is because Rule 13d-3 defines beneficial ownership not by pecuniary interest in a

---

[3] The definition of "group" that applies in Section 16(b) cases is drawn from Section 13(d).

security but rather by reference to the power to vote or dispose of that security. 17 C.F.R. § 240.13d-3(a).[4] Consequently, investment advisors who trade their clients' shares are deemed beneficial owners of those shares, and their clients' holdings count toward their own beneficial ownership of a security, under Section 13(d). Advisors who purchase a sufficient quantity of a security in their clients' managed accounts will become subject to Section 13(d)'s disclosure requirement even if they do not form an insider group with their clients. Indeed, this is one reason why IVA filed a Schedule 13D disclosing its insider status with respect to DeVry. Consequently, Rubenstein's concern is misplaced, and his policy arguments do not persuade us that IVA formed an insider group with its clients.

## III.

Seeking to expand the scope of group liability, Rubenstein points us to Rule 16a-1's exemption of certain registered investment advisors ("RIAs") from the short-swing profit rule.[5] This exemption applies to enumerated "institutions

---

[4] As discussed above, Section 16(b) adopts a second definition of beneficial ownership to narrow the class of transactions subject to the short-swing profit rule. The Section 16(b) definition does refer to pecuniary interest in a security, but that definition does not apply to Section 13(d)'s disclosure requirement.

[5] The SEC adopted this exemption "to avoid undue interference with the day-to-day business of banks, brokers, dealers, investment advisers and other specified

or persons" who hold securities "for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business," provided that the shares are acquired "without the purpose or effect of changing or influencing control of the issuer or [evading reporting requirements]." 17 C.F.R. § 240.16a-1(a)(1). When a covered institution or person satisfies these requirements, it does not qualify as the beneficial owner of its customers' securities for the purpose of the short-swing profit rule's 10% ownership threshold (i.e., its customers' holdings do not count toward its own holdings).[6]

Rubenstein argues that because IVA does not qualify for the RIA exemption, given its control purpose with respect to DeVry, its clients must be

---

institutional fiduciaries and custodians." Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 27148, 54 Fed. Reg. 35667 (Aug. 29, 1989).

[6] Above, we emphasized that a client's holdings generally count toward its investment manager's beneficial ownership of a security for purposes of Section 13(d). Rule 16a-1's RIA exemption applies only to Section 16—which employs a second definition of beneficial ownership and does not affect our analysis of Section 13(d). Additionally, the RIA exemption applies "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities." 17 C.F.R. § 240.16a-1(a)(1). Once a person is deemed the beneficial owner of more than 10%, then the RIA exemption is no longer relevant. For this reason, an advisor who satisfies the RIA exemption but independently qualifies as a statutory insider (e.g., holds more than 10% of a class of securities in its own account or has deputized a director on an issuer's board) may be required to disgorge its performance-related fees. *See id.* § 240.16a-1(a)(2)(ii)(C).

liable as a group. Through this argument, he attempts to turn an exemption that may provide advisors a safe harbor into a rule that advisors must satisfy. In making this attempt, he misses the mark because it is the liability of an IVA client, rather than IVA itself, that is at issue. The RIA exemption excludes certain RIAs from the definition of "beneficial owner"; it does not affect persons who are not RIAs (e.g., their clients). Even more importantly, the exemption makes no reference to group agreements. Whether IVA satisfied the RIA exemption or was a beneficial owner of the securities in question has no bearing on the question of whether it and its clients entered an agreement that would subject it to group liability.

The structure of the statute and rules confirms the independence of the RIA exemption from the definition of a group. "Group" is defined in Section 13(d) of the '34 Act, and this definition is applied to Section 16(b) by Rule 16a-1. The RIA exemption, however, applies "solely to Section 16 of the Act." 17 C.F.R. § 240.16a-1. Accordingly, it filters certain persons who are subject to Section 13(d) out of the pool of persons subject to Section 16(b); it does not expand the class of persons treated as group members under Section 13(d). In a group liability case, if a court determines that a Section 13(d) group has not been formed, the RIA

exemption issue falls by the wayside. In other words, if a group liability defendant has not entered an issuer-specific trading agreement, a court need not ask whether his investment advisor satisfies the RIA exemption.

In pursuit of this argument, Rubenstein directs us to *Egghead.com, Inc. v. Brookhaven Capital Management Co.*, in which we held that investment advisors are not deemed beneficial owners of their clients' shares, for purposes of Section 16(b), when they satisfy the RIA exemption. 340 F.3d 79, 84 (2d Cir. 2003). This straightforward rule does not change our result. This case turns on the criteria for group agreement, not on whether IVA was a beneficial owner of its clients' securities. Moreover, *Egghead* says nothing about liability when an advisor does not meet the RIA exemption.

Simply put, the RIA exemption is a separate component of the short-swing profit rule that is not relevant to this case. When an investment advisor and its clients have not entered an agreement to acquire, hold, vote, or dispose of the securities of a particular issuer, they do not qualify as an insider group. This result is not changed by the RIA exemption.

IV.

In the absence of any agreement to trade in the securities of an issuer, Rubenstein argues for a theory of implied agreement. IVA was a statutory insider that filed a Schedule 13D with the SEC disclosing its status. Rubenstein contends that by silently acquiescing in their advisor's trading for their benefit after the advisor filed that form, IVA's clients implicitly agreed to trade in the securities of DeVry as members of the insider group.

We find no support for this theory in the relevant statutes or regulations. Rubenstein would have us treat all investors as though they were conscious of the securities held by their advisors' other clients and would mandate that they tailor their investment decisions to those other clients' trades. He would further require them to monitor their advisors' activity on various corporate boards and to assess whether their advisors may have adopted a control purpose with respect to particular issuers. Such requirements are impracticable ones that are not contemplated by the securities laws. Section 16(b) is not designed to threaten liability based on the trades of other investors to whom a defendant's only connection is sharing an investment advisor.

Rubenstein claims that these difficulties can be avoided if investment advisors adopt compliance procedures that prevent short-swing trading. However, Rubenstein seeks to hold advisors' clients liable, and those clients may have no control over their advisor's compliance procedures. Rubenstein's proposed theory of liability would demand that clients, who may be unsophisticated individual investors, adopt procedures for monitoring the investments of their advisors' other clients. Rubenstein would hold a retiree on the beach in Florida liable when he fails to conduct an ongoing analysis of his IRA manager's trading in other clients' accounts. We decline to go down this road.

V.

Rubenstein's final theory of liability, raised for the first time on appeal, is that IVA acted as an agent and director by deputization for its clients. We see no merit in this theory. To be sure, there is some support in our precedent for the theory that a statutory insider may not escape liability by merely delegating investment responsibility to an agent. *See, e.g.*, *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 221-22 (2d Cir. 2012). That is, an insider principal cannot shed its insider status by transferring trading authority to a non-insider agent. For example, the

owner of 10% of the outstanding shares of a security may not delegate authority over 5% to an agent and thereby claim to be a 5% shareholder who is not subject to Section 16(b). No authority, however, suggests that a non-insider principal may unknowingly inherit the insider status of its agent.

Rubenstein also points us to a "director by deputization" theory, under which an investor becomes a statutory insider when it deputizes an individual to serve as its representative on an issuer's board of directors. *See generally Blau v. Lehman*, 368 U.S. 403, 408-10 (1962); *Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C.*, 522 F.3d 242, 246 (2d Cir. 2008). IVA argues that, under this theory, IVA's clients were insiders because they hired IVA as their investment advisor and IVA then appointed a director to DeVry's board. Although this appointment may have rendered IVA a statutory insider, it did not render its clients insiders. IVA's clients did not deputize anyone as a director. It is unlikely that most of these clients were even aware that their advisor had deputized a director on the DeVry board. And even if some clients were so aware, there is no indication that they agreed to the deputization. In any event, we conclude that further discussion of these theories is not appropriate because they were not raised in the court below.

In sum, group liability under Sections 13(d) and 16(b) requires that group members "agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1); *see also* 15 U.S.C. § 78m(d)(3). Because Rubenstein's interpretation would read the requirements of agreement and issuer-specificity out of the statute, we reject it.

## CONCLUSION

For the foregoing reasons, the order of the district court is **AFFIRMED**.