In re WORLDCOM, INC.,
et al., Debtors.

WorldCom, Inc. and MCI WorldCom
Network Services, Inc.,
Plaintiffs,

v.

General Electric Global Asset
Management Services,
Defendant.

Bankruptcy No. 02–13533 (AJG).
Adversary No. 03–92903 (AJG).

United States Bankruptcy Court,
S.D. New York.

Feb. 7, 2006.

Heller Ehrman LLP, by Carren B. Shulman, Esq., Jason Blumberg, Esq., New York, NY, by Peter J. Benvenutti, Esq., Peter J. Crosby, Esq., San Francisco, CA, for Plaintiffs WorldCom, Inc and MCI Network Services, Inc.

Reed Smith LLP, Lance Gotthoffer, Esq., by Joseph O'Neil, Jr., Esq., New York, NY, for General Electric Global Asset Management Services.

## OPINION REGARDING PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### I. Introduction

Before this Court are the parties' June 20, 2005 Motions for Summary Judgment.

Both the Plaintiffs, WorldCom, Inc. and MCI WorldCom Network Services, Inc. (collectively, "WorldCom" or "Debtor"), and the Defendant General Electric Global Asset Management Services (collectively, including predecessors-in-interest, "GE") aver that no material issues of fact are in dispute, and further, that each is entitled as a matter of law to judgment in its favor on the matters set forward in WorldCom's Complaint for Declaratory Relief and for Recovery of Unauthorized Postpetition Transfers, filed on November 13, 2003 ("Complaint"). The instant motions concern the essential element of the Complaint, namely WorldCom's contention that the August 1, 1996 Equipment Leasing Agreement ("Agreement") between the parties should be recharacterized by this Court as a financing or security arrangement and treated accordingly under applicable provisions of the Bankruptcy Code.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding pursuant to section 1334(b) of title 28 of the United States Code and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), as this matter arises under sections 549 and 550 of title 11 of the United States Code. This is a "core" proceeding pursuant to section 157(b)(2)(A) of title 28 of the United States Code. This Court has postconfirmation jurisdiction under paragraph 32 of this Court's Order Confirming Debtors' Modified Second Amended Joint Plan of Reorganization under chapter 11 of title 11 of the United States Code (Oct. 31, 2003) ("Plan"). *Hospital and University Property Damage Claimants v. Johns–Manville Corp.* (*In re Johns–Manville Corp.*), 7 F.3d 32, 34 (2nd Cir.1993).

## III. Background

The contractual relationship between GE's predecessor-in-interest USL Capital Corporation ("USL") and WorldCom at issue in the instant adversary proceeding emerged in connection with WorldCom's acquisition from Northern Telecoms, Inc. ("Nortel") of over $100 million worth of commercial telecommunications transmission equipment ("Nortel Equipment") in the spring of 1996 ("Nortel Purchase"). In order to finance the purchase of this equipment, WorldCom entered into eight similar "leases" (collectively, "Nortel Leases") with a total of seven companies (collectively, "Financing Companies"), including USL. In broad terms, these arrangements provided that the Financing Companies would first purchase the Nortel Equipment as assignees of WorldCom to the Nortel Purchase, and then lease that equipment to WorldCom for use in WorldCom's fiber optic telecommunications system. USL agreed to finance approximately $9.8 million worth of the Nortel Equipment ("USL Equipment"), and the Agreement reflects the arrangement the parties devised to accomplish this.

In its relevant articles, the Agreement provided that the Basic Term of the lease would run for 84 months. WorldCom would pay monthly "rental" payments of $122,895.89 for the first forty-one months, $147,687.63 for months forty-two through fifty-two, and $150,169.31 for the remaining months of the Basic Term, not including applicable sales taxes for which WorldCom was responsible. The Agreement thus contemplated that over the Basic Term of the lease, WorldCom would pay approximately $11.5 million in rental payments. Upon expiration of the Basic Term after 84 months, the Agreement provided that WorldCom could either: (1) renew the lease for an additional 12 month term at a monthly

rent of $135,518.09, for a total payment of $1,638,217.08 over the twelve month term ("Basic Term Renewal Option"); or (2) purchase the equipment for the greater of the fair-market value of the equipment or 15% of the total acquisition cost of the equipment ("Basic Term Purchase Option").[1] The Agreement further stated that in the absence of written notice from WorldCom expressing its intention to exercise the Basic Term Purchase Option, WorldCom would be presumed to have exercised the Renewal Option. If WorldCom exercised or was deemed to have exercised the Renewal Option, the Agreement provided that WorldCom could, at the end of the 12 month Renewal Term, either: (1) purchase the equipment for fair-market value ("Renewal Term Purchase Option"); or (2) return the equipment to USL and end the contractual relationship ("Renewal Term Return Option").

The Basic Term of the Agreement commenced on September 6, 1996 and was scheduled to end on September 6, 2003. However, in light of its crumbling financial position, WorldCom filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court on July 21, 2002 ("Petition Date"), before the expiration of the Basic Term of the Agreement. As of the Petition Date, WorldCom had not defaulted on the Agreement, but had made all monthly payments as required. Moreover, it continued making such payments following its petition for bankruptcy for the period from August 2002 through July 2003, one month prior to the expiration of the Basic Term. Nonetheless, as part of its reorganization efforts, on April 30, 2003, WorldCom filed Notices of Rejection pursuant to 11 U.S.C. § 365(a) in re-

gard to the leases with four of the Financing Companies: Key Corp. Leasing Ltd., AmSouth Leasing Corporation, JPMorgan Leasing, Inc., and CIT Lending Services Corporation. WorldCom then filed additional Notices of Rejection with two other Financing Companies: Citizens Leasing Corporation on May 4, 2003, and BTM Capital Corporation and Diamond Lease (USA), Inc. on June 6, 2003. Finally, on June 10, 2003, WorldCom filed a Notice of Rejection as to the Agreement with GE at issue here.

A number of the Financing Companies, including GE, filed Objections to the Notices of Rejection on the grounds that WorldCom proposed to return only equipment of "like grade and quality," and not the specific equipment each company had leased to WorldCom. In response, WorldCom entered into negotiations with the Financing Companies concerning the Nortel Leases and future disposition of the Nortel Equipment. By July 10, 2003, WorldCom had reached settlement agreements with each of the Financing Companies except GE. Under these settlements, WorldCom agreed to purchase the leased equipment and satisfy any outstanding obligations arising from the lease agreements.

For reasons not clear from the record, settlement negotiations between WorldCom and GE were not as fruitful as such negotiations had been with the other Financing Companies. As a result, on November 17, 2003, WorldCom filed its Complaint in this Court and instituted the instant adversary proceeding against GE. In its Complaint, WorldCom asserted that the Agreement was not a true lease but a disguised security arrangement, a position it had not previously taken with regard to

---

**1.** The Agreement originally provided that WorldCom had the additional option at the end of the Basic Term of returning the equip-

ment to USL and thus completing the lease. However, a contemporaneously executed amendment withdrew that option.

the other financing agreements. World-Com petitioned this Court for a declaratory judgment to that effect, and asserted other claims under the Bankruptcy Code based on its contention that GE's interest in the USL Equipment should be treated as a security interest.

GE filed a Motion to Dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) on December 30, 2003, arguing that judicial estoppel barred WorldCom from asserting that the Agreement was a disguised security arrangement. This Court denied GE's motion in an order dated May 17, 2004, as subsequently amended on July 29, 2004, which order was appealed to the District Court for the Southern District of New York. A hearing was held before the Honorable Barbara S. Jones on October 28, 2004. The district court thereafter denied GE's Motion for Leave to Appeal.[2]

Subsequently, the parties engaged in factual and expert discovery. Following the close of discovery, the parties filed the instant Motions for Summary Judgment, subsequently supplemented by multiple memoranda in opposition. This Court held a hearing on the parties' respective motions on October 21, 2005.

## IV. Issues Presented

The issues presented by the Complaint and the parties' motions may be simply described, even if their ultimate resolution may be more difficult. At the heart of this dispute is WorldCom's contention that the Agreement is not a true lease, as the Agreement so defines itself, but rather a disguised security arrangement. This proposition anchors the Bankruptcy Code claims WorldCom raises in its Complaint. If WorldCom can establish that the Agreement created a security interest in the USL Equipment, the Bankruptcy Code will treat WorldCom's obligations differently than it would if the Agreement was a true lease. In particular, WorldCom argues that any "rental payments" made after the Petition Date were unauthorized postpetition transfers subject to avoidance and recovery pursuant to 11 U.S.C. §§ 549, 550. Additionally, WorldCom seeks a declaratory judgment that GE's rights as a secured creditor may be satisfied by the return of equipment of "the same make, model, and vintage" as the USL Equipment. If, however, this Court does not conclude the Agreement is a disguised security arrangement, WorldCom has also raised alternative issues concerning its obligations to GE under the Agreement and the Bankruptcy Code. Similarly, based upon its contention that the Agreement is a true lease, GE has asserted claims of administrative relief for postpetition rent payments.

It is clear therefore that the primary issue this Court must address is the proper legal characterization of the Agreement. Upon that determination rests much of the substantive conclusions this Court must reach concerning the parties' respective obligations.

## V. Summary Judgment and Burden of Proof

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, states that summary judgment should be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is

---

2. As will be discussed shortly, GE has raised questions concerning the scope of this Court's

July 29, 2004.

"material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "When the movant demonstrates through competent evidence that no material facts are genuinely in dispute, the non-movant must set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2nd Cir.1990) (internal quotation omitted). *See also, Celotex Corp. v. Catrett,* 477 U.S. 317, 323–325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be "viewed in the light most favorable to the party opposing the motion." *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1352 (2nd Cir.1994) (citations omitted). Furthermore, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Where, as here, a party has filed a cross-motion for summary judgment, the Court must pay particular attention to the parties' respective burdens of proof, persuasion, and production. When faced with a cross-motion for summary judgment, the court must consider the merits of each motion independently of the other. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2nd Cir.1993). Although it maybe implied from the filing of a cross-motion that the parties have agreed that no material issues of fact exist, the court is not bound by this implicit agreement and is not required to enter a judgment for either party. *Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115, 121 (2nd Cir.2001). *See also Aviall, Inc. v. Ryder System, Inc.,* 913 F.Supp. 826, 828 (S.D.N.Y.1996), *aff'd,* 110 F.3d 892 (2nd Cir.1997). Moreover, "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein,* 996 F.2d at 1461. When analyzing each motion, the court must be careful to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.*

■ The burden of proof at trial will rest with WorldCom as the party seeking to characterize the Agreement as something "other than what it purports to be." *In re Owen,* 221 B.R. 56, 60 (Bankr. N.D.N.Y.1998). *Accord In re QDS Components, Inc.,* 292 B.R. 313, 321–322 (Bankr.S.D.Ohio 2002) ("As the party asking the Court to characterize the Lease Agreements as 'other than what they purport to be,' [the defendant] bears the burden of proof.") (quoting *In re Murray,* 191 B.R. 309, 316 (Bankr.E.D.Pa.1996)); *In re Triplex Marine Maint., Inc.,* 258 B.R. 659, 664 (Bankr.E.D.Tex.2000); *In re Edison Bros. Stores, Inc.,* 207 B.R. 801, 812 (Bankr.D.Del.1997); *In re Zaleha,* 159 B.R. 581, 586 (Bankr.D.Idaho 1993). Therefore, to succeed on a motion for summary judgment, WorldCom must satisfy its burden of proof as at trial. *See Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. 2548. GE, as the party not bearing the burden of proof at trial, can satisfy its burden of production as movant by simply showing that little or no evidence may be found to support WorldCom's claim. *Id.* If GE carries this initial burden of production, WorldCom must set forth specific facts that show triable issues of fact exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## VI. Judicial Estoppel

■ In its December 30, 2003 Motion to Dismiss pursuant to Rule 12(b)(6), GE argued that WorldCom was barred by judicial estoppel from asserting in its Complaint that the Agreement created a security interest and not a lease. Briefly, GE based this contention on WorldCom's treatment of the other Nortel Leases and this Court's approval of the settlements reached in regard to those leases. In its instant Motion for Summary Judgment, GE has reasserted this judicial estoppel argument.

The Court previously ruled on the issue of judicial estoppel in its May 17, 2004 order, and, at the request of WorldCom, clarified that order in its July 29, 2004 order. In both orders this Court stated that the elements for judicial estoppel had not and could not be established here. In addition, GE's Motion for Leave to Appeal the July 29, 2004 order was denied by the district court on October 28, 2004. However, in its Motion for Summary Judgment, GE distinguishes the instant claim and argues that it has not been fully adjudicated. GE argues that this Court's July 29, 2004 order only adjudicated the judicial estoppel claim as it was presented on a Rule 12(b)(6) motion to dismiss. GE contends that it may still raise the issue in a motion for summary judgment, as the evidentiary standards for summary judgment motions are more expansive than for Rule 12(b)(6) motions. Nonetheless, this Court finds that GE's judicial estoppel claim fails under either evidentiary standard, as was specifically stated in the July 29, 2004 order. Accordingly, the Court reiterates its finding that WorldCom is not barred by judicial estoppel from asserting that the

Agreement is a disguised security arrangement.

## VII. Lease or Security Interest

■ Although the Bankruptcy Code recognizes the distinction between true leases and security arrangements and treats the two differently, particularly in regard to the lessor/creditor's rights as against the bankrupt estate and trustee, state commercial law determines whether a contractual agreement is to be characterized as either a lease or security arrangement. *See Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"); S.Rep. No. 595, 95th Cong., 1st Sess. 314, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6271. As courts have consistently recognized, whether a "lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state or local law." *Powers v. Royce, Inc. (In re Powers),* 983 F.2d 88, 90 (7th Cir.1993). The Agreement contains a choice-of-law clause that provides that it will be governed by California state law. Neither of the parties dispute the application of this choice-of-law clause, and as the Court concurs that California law governs, that law will accordingly be applied here.

Section 1201(36) of the California Commercial Code defines a "security interest" and provides two tests for distinguishing security interests from true leases. Section 1201(36) is itself a codification of § 1–201(37) of the Uniform Commercial Code as amended in 1987.[3] As the UCC is

---

**3.** Cal. Comm.Code § 1201(36) is identical to UCC § 1–201(37) in all relevant areas. The parties have referred in their documents to both Cal. Comm.Code § 1201(36) and UCC § 1–201(37). For sake of clarity, and in keeping with what appears to be a judicial convention, therefore, this Opinion will refer to UCC § 1–201(37) in its discussion of the issues.

intended as a uniform law, the Court will consider decisions from other state and federal courts interpreting § 1–201(37). *See PSINet, Inc. v. Cisco Systems Capital Corp.*, 271 B.R. 1, 41, 43 (Bankr.S.D.N.Y. 2001); *In re Edison Bros.*, 207 B.R. 801, 809 n. 7 (Bankr.D.Del.1997) ("Since the UCC has been adopted by all 50 states, and given the uniformity purpose of the UCC, decisions from other states are relevant.").

■ Though the concepts expressed in § 1–201(37) are rather easily defined, the means to distinguish between them in a rigorous manner has often eluded the courts. *See, e.g.*, Michael W. Gaines, *Security Interests Under Article 2A: More Confusion in the Leasing Arena*, 18 Stetson L.Rev. 69, 69 (Fall 1988) (noting "the plethora of litigation regarding lease agreements and leased equipment"); Edwin E. Huddleson, *Old Wine in New Bottles: UCC Article 2A—Leases*, 39 Ala. L.Rev. 615, 623–639 (1988) ("drawing [the distinction between true leases and security interests] has proved to be a difficult and frequently litigated problem"). As the leading treatise on the UCC has defined these concepts, "A *lease* involves payment for the temporary possession, use, and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast, ... a *security interest* is only an inchoate interest contingent on default and limited to the remaining secured debt." James J. White & Robert S. Summers, *Uniform Commercial Code* vol. 4, § 30–3, 14 n. 18 (5th ed. West 2002) (emphasis added). *See also*, U.C.C.

Section 2A–101(1)(j) (" 'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration, but ... retention or creation of security interest is not a lease."). The prior version of § 1–201(37) ("Old § 1–201(37)") provided little guidance as to how to apply those concepts in practice, leading the courts to develop a range of tests in order to provide criteria for distinguishing between the two. White & Summers, § 30–3 at 3. *See also, In re Kim*, 232 B.R. 324, 329 (Bankr.E.D.Pa.1999) (noting "a profusion of inconsistent views [developed] among the courts regarding the proper criteria to be applied in determining whether an agreement denominated as a lease created a true lease or a security interest"); E. Carolyn Hochstadter Dicker & John P. Campo, *FF & E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1–202(37)*, 7 Am. Bank. Inst. L.Rev. 517 (Winter 1999) (analyzing the provisions of § 1–201(37) in reference to the major tests that developed under Old § 1–201(37)).

■ Section 1–201(37) attempts to provide a more rigorous statutory standard to guide the courts in their analysis of the security interest question.[4] *Addison v. Burnett*, 41 Cal.App.4th 1288, 1294–1295, 49 Cal.Rptr.2d 132, 136 (1996) ("In our view, the amendment was intended to clarify the process of determining the nature of these contracts, not to change the substance of the law."). In structure, § 1–201(37) requires the court to apply sequentially two distinct tests. *See In re Lerch*, 147 B.R. 455, 460 (Bankr.C.D.Ill.1992) (analyzing the structure and application of

However, all references to specific provisions will use the numbering scheme provided by Cal. Comm.Code § 1201(36).

4. As has been noted, § 1–201(37) incorporates, to varying degrees, a number of standards previously developed by the courts, and also clearly rejects certain other standards. *QDS*, 292 B.R. at 323–33; White & Summers, § 30–3, at 4–5.

§ 1–201(37)). The first is a "Bright–Line Test" designed to provide the courts with a per se standard. The Bright–Line Test requires the Court to determine whether the contractual terms of the Agreement, either on their face or as applied, bear certain characteristics the statute defines as conclusive evidence that a security interest was created. *Owen*, 221 B.R. at 60; *Addison*, 41 Cal.App.4th at 1296, 49 Cal. Rptr.2d at 136. *See also*, Dicker & Campo, 7 Am. Bankr.Inst. L.Rev. at 546–547 ("courts interpreting the statute have found it to mandate a finding of a security interest if the [Bright–Line Test] is satisfied"). The second test, to be applied if the Bright–Line Test is not satisfied, is a contextual analysis that asks the court to determine whether "the facts of each case" demonstrate that a security interest was created.

A.   Bright–Line Test

Section 1–201(37) provides:

(b) Whether a transaction creates a lease or security interest is determined by the facts of each case. However, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and any of the following conditions applies:

(i) The original term of the lease is equal to or greater than the remaining economic life of the goods.

(ii) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.

(iii) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(iv) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

In applying this test, the first question the Court must ask is whether "the consideration the lessee is to pay the lessor ... [is] for the term of the lease and not subject to termination by the lessee." WorldCom asserts and this Court agrees that there is no issue of fact as to this question, and thus this Court finds that WorldCom was obligated for the term of the lease and did not possess a right of termination.

The second question the Court must ask is whether any of the four stated conditions is met. These factors have been referred to by some courts as the "Residual Value Factors" and focus on whether the express terms of the lease demonstrate that "the lessor is not retaining a substantial residual interest in the leased property." *PSINet*, 271 B.R. at 44–45; Dicker & Campo, 7 Am. Bank. Inst. L.Rev. at 537. WorldCom asserts that the fourth condition is met and argues that the Basic Term Purchase Option was for nominal consideration.[5]

5. In its Complaint, WorldCom also argues that the Bright–Line Test is satisfied on the basis of the second listed condition, subsection (ii). Complaint, ¶ 30(c). However, in none of its subsequent memoranda or replies does WorldCom detail or support this argument. The Court will, therefore, dispose of this claim by noting first, that no evidence has been introduced to clearly establish the "remaining economic life of the goods," and second, that it is clear WorldCom is not "bound to become the owner of the goods" because WorldCom may return the USL Equipment upon expiration of the Renewal Term. Therefore, the Court denies World-Com's motion as to this issue.

WorldCom anchors its argument on the definition of "nominal" consideration provided in § 1–201(37)(d)(i), which states:

> Additional consideration is not nominal if (A) when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (B) when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.

WorldCom argues that the last definition, based on the lessee's reasonably predictable cost of performance, is applicable here.[6] This definition is a codification in part of the common law Economic Realities Test.[7] See QDS, 292 B.R. at 335 n. 11; Dicker & Campo, 7 Am. Bankr.Inst. L.Rev. at 540. The Economic Realities Test essentially questions whether, "at the end of the lease term, the only economically sensible course for the lessee to take is to exercise the option to purchase the property." The definition provided in § 1–201(37)(d)(i) adopts this test to the extent that performance of any lease obligations, such as here, the renewal term, or elsewhere, the removal and return of the equipment, is more than the purchase option price.[8]

**6.** In the discussion regarding § 1–201(37), it should be understood that "nominal" is used in its relative, rather than absolute, sense. As few contracts provide for absolutely nominal consideration, e.g., $1, courts have had to devise tests to determine whether absolutely non-nominal consideration is relatively nominal and thus evidence of a disguised security interest. See PSINet, 271 B.R. at 45, for example of one case where consideration of $1 was found to be absolutely nominal.

**7.** The Economic Realities Test is also referred to in the case law as the "sensible person test," See Triplex Marine, 258 B.R. at 671, the "No Sensible Alternative But to Exercise the Option" Test, See In re Lykes Bros., 196 B.R. 574, 581–582 (Bankr.M.D.Fla.1996), and the "No Lessee in its Right Mind Test," See Morris v. Dealers Leasing, Inc. (In re Beckham), 275 B.R. 598, 603 (D.Kan.2002).

**8.** There is a certain lack of conceptual clarity evident in the case law concerning the various tests courts apply to determine nominality. Courts consistently refer to tests by different names and offer different justifications for applying essentially the same test. The courts have uniformly concluded that nominality may be established by both (1) comparing the option price to the fair market value of the goods and (2) comparing the option price to the cost of performing any lease obligations. Additional tests have been proposed and ap-

plied, but it is questionable whether those tests remain valid following the revision of § 1–201(37). Of the two universally accepted tests, courts often refer to the latter as the Economic Realities Test. However, this is not a consistent convention, and, as noted supra, note 7, other labels have been used. It is also questionable whether, conceptually speaking, this is an accurate convention. The Economic Realities Test is conceptualized in terms of economic compulsion. As one court stated, "[w]here the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option ... the lease was intended to create a security interest." Steele v. Gebetsberger (In re Fashion Optical, Ltd.), 653 F.2d 1385, 1389 (10th Cir.1981). It is for this reason that the "cost of performance" test is referred to as a codification of the Economic Realities Test, as a lessee is economically compelled to exercise a purchase option where the performance of the lease is more costly. However, the same reasoning applies to the former of the two tests described above, where the option price is lower than the fair market value of the goods. In such circumstances, the lessee is similarly compelled to exercise the option because the lessee can capture the value represented by the difference between the option price and the fair market value. Nonetheless, for reasons that are unclear, only the latter test is

WorldCom defines the cost of performance as the present value as of the conclusion of the Basic Term of (1) the rental payments due under the Basic Term Renewal Option, plus (2) the fair market value ("FMV") of the USL Equipment at the conclusion of the Renewal Term, minus (3) the remaining economic value of the Equipment at the conclusion of the Renewal Term. WorldCom calculates the cost of performance as no less than $1,501,206.00. WorldCom then defines the cost of the Basic Term Purchase Option as no more than $1,294,140.00, based upon a range of depreciation schedules over the life of the Basic Term. WorldCom urges the Court to conclude therefore, that, as a matter of law, the Basic Term Purchase Option constitutes nominal consideration, as it is less than WorldCom's reasonably predictable cost of performing the lease if it chose not to purchase the USL equipment at the expiration of the Basic Term.

GE argues in response, and this Court agrees, that WorldCom's evidence is flawed as a matter of law. Section 1–201(37)(d)(i) states that the additional consideration must be less than the "reasonably predictable" cost of performance. "Reasonably predictable" is defined by § 1–201(37)(d)(ii), which provides that "reasonably predictable" is "to be determined with reference to the facts and circumstances at the time the transaction was entered into." Therefore, WorldCom must show that the "reasonably predictable" cost of performance is greater than the cost of the Basic Term Purchase Option.

■ This evidentiary provision derives from a more general principle recognized by courts and commentators alike: "When the parties sign the contract and become bound, they have either made a lease or a security agreement. That agreement is referred to as the Economic Realities Test in

based upon their present judgments about values, useful life, inflation, risk of non-payment, and other matters.... Foresight not hindsight controls." White & Summers, § 30–3 at 9. Based on this principle, the courts have concluded that "the date of the transaction, rather than a future date, is the more appropriate point to determine the adequacy of the option price." *In re Zaleha*, 159 B.R. 581, 586 (Bankr.D.Idaho 1993). Thus, in assessing the nominality of a purchase option vis-à-vis the FMV of the goods, "the proper figure to compare [the option price] with is not the actual fair market value of the leased goods at the time the option arises, but their fair market value at that time *as anticipated* by the parties when the lease is signed." *In re Marhoefer Packing Company, Inc.*, 674 F.2d 1139, 1144–1145 (7th Cir.1982) (emphasis added). *Accord Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258, 1262 (7th Cir.1991). *See also, In re Buehne Farms, Inc.*, 321 B.R. 239, 245 (Bankr. S.D.Ill.2005) ("However, the Court is unable to make the analysis called for in *Marhoefer* because the parties have provided no evidence of the fair market value they *predicted* the cows would have at the conclusion of the agreements.") (emphasis added); *In re APB Online*, 259 B.R. 812, 819 (Bankr.S.D.N.Y.2001) ("The first test compares the option price, not to the actual fair market value at the time the option is exercised, but to what the parties thought the fair market value would be on the exercise date when they entered into the lease."); *In re Architectural Millwork of Virginia, Inc.*, 226 B.R. 551, 557 (Bankr. W.D.Va.1998) ("the parties' testimony indicated that the $9,625.00 [option price] was a fair estimate, when made at the time the agreement was executed, of the vehicle's anticipated value at the conclusion of the lease payments"); *Kimco Leasing, Inc. v.*

the literature and case law.

*State Board of Tax Commissioners,* 656 N.E.2d 1208, 1215 (Ind. Tax Ct.1995) (requiring "some concrete information regarding the *anticipated* fair market value of the leased equipment at the time the purchase option is to be exercised") (emphasis added); White & Summers, § 30–3 at 10 ("Nominality, therefore, must be determined by considering the parties' *prediction* of concluding value at signing, not by considering the actual value at the conclusion of the term.") (emphasis in original); Huddleson, 39 Ala. L.Rev. at 633 ("Transactions are not true leases where the parties anticipate, at the outset of the transaction, that the option will be irresistible in the sense that the option price is extremely low in comparison to the fair market value of the property.").

■ Section 1–201(37)'s "reasonably predictable" standard is simply a codification of that conclusion.[9] As the court in *QDS* noted in holding that the "cost of performance" test had not been satisfied: "The record therefore contains no evidence establishing what the original parties to the transaction *anticipated* concerning [the Debtor's] 'cost of performing under the [agreements] if the [purchase option] is not exercised.'" 292 B.R. at 337 (emphasis added). *See also In re Grubbs,* 319 B.R. 698, 717 (Bankr.M.D.Fla.2005) (noting that the Economic Realities Test in general "focuses on all the facts and circumstances surrounding the transaction as anticipated by the parties at contract inception, rather than at the time the option arises.") (citing *QDS*). Thus, in analyzing nominality, the "reasonably predictable" cost of performance is the cost of perform-

ance as anticipated by the parties at the time the Agreement was signed.

■ WorldCom, however, has failed to introduce evidence as to the anticipated or expected cost of performance if the Basic Term Purchase Option was not exercised. To establish the anticipated cost of performance, WorldCom must offer evidence of the relative costs of the Renewal Term Purchase Option and the Renewal Term Return Option, the lesser of which must then be compared to the Basic Term Purchase Option. The costs of these various options will depend in turn on the value of the USL Equipment at the end of the Basic Term, the value of the equipment at the end of the Renewal Term, and the cost of removing and returning the USL Equipment to GE at the end of the Renewal Term. As the Court must compare the expected cost of performance to the expected cost of purchase, it follows that WorldCom must also establish the value of the USL Equipment at the end of the respective terms and the cost of removal relative to the parties' expectations at the outset of the Agreement.

WorldCom has simply not offered such evidence. For example, in calculating the cost of the Renewal Term Return Option, WorldCom assumed that removal and return of the USL Equipment would cost $50,000, for which figure WorldCom provided no basis for concluding that it represents the cost as anticipated by the parties, or for concluding on what facts it rests if any. More crucially, WorldCom calculated the value of the USL Equipment at the end of the Basic and Renewal Term on the basis of a range of possible

9. As the case law cited above reflects, this evidentiary issue more often arises when determining nominality by comparing the option price to the FMV of the goods. Since courts have consistently concluded that the option price must be compared to the FMV as anticipated by the parties, the reference to "reasonably predictable" is presumably intended to expressly require courts to apply the same analysis when comparing the option price to the cost of performance.

depreciation models. Although those models do offer *a priori* estimates to the extent that they proceed deterministically from the value of the USL Equipment at the outset of the Agreement, WorldCom has not established which, if any, model the parties used to predict the value of the equipment at relevant points in the future.

WorldCom has not seriously attempted to assert that its evidence reflects the parties' expectations at the time the Agreement was signed. Rather, WorldCom argues on two grounds that evidence of the parties' expectations is not required to establish the "reasonably predictable" cost of performance. WorldCom argues first that the above-cited case law stands only for the proposition that the "reasonably predictable" cost of performance must be determined based on the facts and circumstances existing at the inception of the agreement. WorldCom further contends that this evidentiary standard may be satisfied by introducing evidence of what a reasonable person, at the time the Agreement was signed, would have calculated the cost of performance to be, which WorldCom argues it has done by introducing evidence of the range of reasonable depreciation models as proof of the set of reasonable calculations of cost. WorldCom argues second that evidence of the parties' expectations cannot be required, as any such examination implicates examination of the parties' intentions, consideration of the which, WorldCom argues, is precluded by § 1–201(37).

As to WorldCom's first argument, this is plainly an incorrect interpretation of the case law. WorldCom seeks to excise and render meaningless the courts' repeated reference to the need to examine the "anticipated" or "predicted" value of goods and contractual options. The Court declines to eviscerate the plain meaning of those holdings. For the same reason, the Court does not believe that these holdings are merely illustrative of a more general principle that embraces alternative standards.

As to WorldCom's second argument, WorldCom is certainly correct in asserting that the current version of § 1–201(37) rejects consideration of the parties' intentions as a probative factor to be examined when analyzing an agreement. The Official Comment to § 1–201(37) states:

> Prior to this amendment, [Old § 1–201(37)] provided that whether a lease was intended as security (i.e. a security interest disguised as a lease) was to be determined from the facts of each case.... Reference to the intent of the parties to create a lease or security agreement has led to unfortunate results.... Accordingly, amended section 1–201(37) deletes all reference to the parties' intent.

Recognizing this shift, the court noted in *PSINet* that, "[u]nder California law, the determination of whether an agreement creates a true lease ... or a security interest ... is dependent on the economics of the transaction, and not the intent of the parties." 271 B.R. at 43. *See also, Duke Energy Royal, LLC v. Pillowtex Corp.*, 349 F.3d 711, 721 (3rd Cir.2003) ("Duke's intent argument fails, however, because the New York U.C.C. no longer looks to the intent of the drafting parties to determine whether a transfer is a lease or a security arrangement."); Dicker & Campo, 7 Am. Bankr.Inst. L.Rev. at 532–533 ("Whether a lease is intended as a security interest is to be determined on an objective basis. In conducting such analysis, the courts are required to disregard the form of the agreement or the stated intent of the parties that the agreement be a 'lease' and, instead, must look at the agreement's economic effect on the parties"). *Cf.* White & Summers, § 30–3 at 3 ("[Old 1–201(37)]

posed the question whether the lease was 'intended as security.' ... We suspect that few courts were thus misled. Courts often recite the shibboleth that they decide in accord with the 'parties' intentions' when their decision is based ... upon the substantive attributes of the transaction set out in writing and so on objective manifestation of intent—if intent plays any role.")

However, WorldCom's contention that this statutory revision effectively overrules the case law cited above is without merit. WorldCom has cited no decision rejecting examination of the parties' expectations on such grounds, and its citations to certain commentators in support of a reasonable person standard are misplaced in light of the great body of commentary recognizing the continued need to examine the parties' expectations.[10] *See, e.g.,* White & Summers, § 30–3 at 10; Huddleson, 39 Ala. L.Rev. at 633. The parties' expectations and predictions are properly considered objective facts in that they constitute in large part the economic realities and context in which the agreement was made. Such predictions may be considered subjective to the extent that they reflect unique valuations, but it is for precisely that reason that such predictions must be given effect by the courts. The courts simply cannot place themselves in the position to substitute the putatively "reasonable" person's judgment in place of the business judgment of the parties.[11] Rather, the statutory revision was intended solely to overrule those decisions holding

that the parties' intent operates as a legal conclusion as to what type of agreement was created.

In light of the foregoing, the Court therefore concludes that WorldCom has failed to satisfy its burdens of production and proof to establish that the Agreement should be characterized as a security arrangement per the Bright–Line Test of § 1–201(37). The Court does not conclude, however, that GE is entitled to partial summary judgment in its favor on this issue. GE has not introduced evidence of the parties' expectations to support its position that the Bright–Line Test is not satisfied, nor has GE argued that no such evidence may be offered in support of WorldCom's position. Therefore, the Court finds that WorldCom should be afforded to opportunity to introduce evidence that conforms to the evidentiary standard the Court has just articulated. Accordingly, neither party is entitled to judgment in its favor on this issue.

## B. Contextual Analysis

This conclusion does not, however, end the Court's inquiry. Rather, as noted above, failure to satisfy the Bright–Line Test requires that the Court engage in a contextual analysis to determine whether the "facts of [the] case" evidence the creation of a security arrangement or a true lease. *See Lerch,* 147 B.R. at 460; *Addison,* 41 Cal.App.4th at 1296, 49 Cal.Rptr.2d at 136–137.

---

**10.** Contrary to WorldCom's assertion, the case law cited above reflects decisions reached under the revised § 1–201(37).

**11.** The only argument WorldCom offers to justify its reasonable person standard is essentially an argument from fairness. WorldCom suggests that it is unreasonable to require it to provide evidence of the parties' expectations, as this would presumably require WorldCom

to introduce testimony from participants in the original transaction or documents expressing those participants' positions. Considering that the parties were sophisticated business entities contemplating a $100 million purchase, and thus may be expected to have recorded their projections, the Court does not find it unreasonable to require such evidence.

Section 1–201(37) provides limited guidance to the courts as to how this inquiry should be pursued. *See* Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A,* 25 U. Mem. L.Rev. 873, 891 (1995); Ronald M. Bayer, *Personal Property Leasing: Article 2A of the Uniform Commercial Code,* 43 Bus. Law. 1491, 1498 (August 1988). The courts are instructed to examine the "facts of each case," but the statute does not provide any standards for determining which facts are relevant or how relevant facts should be weighed in the final determination. The sole textual guidance is a list of six factors that are characterized as not sufficient alone to establish that a security interest has been created.[12] That list was intended to overrule certain cases holding that the presence of one of these factors was alone sufficient for concluding that an agreement was a security arrangement, White & Summers, § 30–3, at 7, but it provides no guidance in determining what fact or set of facts would justify the court concluding

that an agreement created a security interest.

In the absence of statutory guidance, courts have been forced to fashion judicial standards and tests to analyze "the facts of the case." The majority of courts and commentators have agreed that the principle inquiry is "whether the lessor has retained a *meaningful reversionary interest* in the goods." *Addison,* 41 Cal.App.4th at 1296, 49 Cal.Rptr.2d at 136–137 (emphasis added). As one commentator has described this concept:

> At common law, the central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term. Ordinarily this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term. Huddleson, 39 Ala. L.Rev. at 625.

---

**12.** (c) A transaction does not create a security interest merely because it provides one or more of the following:

  (i) That the present value of the consideration the lessee is obligated to pay for the right to possession and use of the goods is substantially equal to or greater than the fair market value of the goods at the time the lease is entered into.

  (ii) That the lessee assumes the risk of loss of the goods, or agrees to pay the taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods.

  (iii) That the lessee has an option to renew the lease or to become the owner of the goods.

  (iv) That the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed.

  (v) That the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

  (vi) In the case of a motor vehicle, as defined in Section 415 of the Vehicle Code, or a trailer, as defined in Section 630 of that code, that is not to be used primarily for personal, family, or household purposes, that the amount of rental payments may be increased or decreased by reference to the amount realized by the lessor upon sale or disposition of the vehicle or trailer. Nothing in this subparagraph affects the application or administration of the Sales and Use Tax Law (Part 1 (commencing with Section 6001), Division 2, Revenue and Taxation Code).

Cal. Comm.Code § 1201(36).

Similarly, another commentator explains the principle in reference to the parties' "entrepreneurial stake," the "up-side right or down-side risk," that each party has in the value of the leased equipment. White & Summers, § 30–3 at 2, 9–10. *See also* Dicker & Campo, 7 Am. Bankr.Inst. L.Rev. at 533 (noting that courts have consistently held that in a lease, the lessee must have a right to return the goods with a "significant residual value"). The rationale behind this principle is clear, though circular. If the lessor does not possess a meaningful reversionary interest, the lessor has no interest in the economic value or remaining useful life of the goods, and therefore the lessor transferred title to the goods, in substance if not in form. In other words, the parties did not create a lease where the putative lessor does not have the interest, the entrepreneurial stake, in the goods that a true lessor would have. The challenge for the courts therefore is to first establish the indicia that evidence a reversionary interest in the leased goods and then determine whether those indicia are apparent in the case at hand.

In *Addison*, the court set out the reversionary interest analysis to be applied under California law. As the court stated: "Two features of a lease must be examined in this light: (1) any option to purchase and (2) any provision for the lessee's acquisition of equity in the goods." *Addison*, 41 Cal.App.4th at 1296, 49 Cal.Rptr.2d at 137. *See also*, *QDS*, 292 B.R. at 342 (applying *Addison* to determine whether the lessor has a meaningful reversionary interest under California law). The *Addison* court derived this analysis from two federal bankruptcy decisions, *In re Zaleha*, 159 B.R. 581, and *In re Bumgardner*, 183 B.R. 224 (Bankr.D.Idaho 1995). The court in *Zaleha* noted "these two factors ... have been recognized as the more important in determining the lease/security interest dis-

tinction." 159 B.R. at 585 (citing *Arnold Machinery Co. v. Trustee Service Corp. (In re Hodge Lumber & Wholesale, Inc.)*, 86 I.B.C.R. 28, 29 (Bankr.D.Idaho 1986)). The Court will therefore look to these cases as well in assessing whether GE retained a meaningful reversionary interest in the USL Equipment.

■ GE argues that these factors constitute the exclusive list of considerations the court may examine in answering this question. The Court does not agree. Though these two factors have been considered the most relevant and useful, there is no suggestion in *Addison* that no other factors may be considered. Indeed, the court in *Zaleha* and *Bumgardner* justified its use of the two *Addison* factors on the ground that they were the only two factors, out of a list of seven factors that the courts had examined under Old § 1–201(37), that the revised statute did not explicitly or implicitly reject as relevant. This leads the Court to conclude that the court in *Zaleha* and *Bumgardner* was merely refining its prior jurisprudence, and by extension, was not enunciating a set of factors that constitute the exclusive considerations of the court. Furthermore, in noting that "we must look to the facts of the case to determine whether [the lessor] relinquished its reversionary interest in the [goods] under the terms of the agreement," the court in *Addison* properly emphasized that the focus must be on this ultimate conclusion. Finally, that the court in *QDS*, in applying California law, limited itself to consideration of the two *Addison* factors is not persuasive evidence that this Court cannot consider any additional relevant factors. Rather, the Court concludes that the *Addison* factors are merely useful proxies to aid it in analyzing whether the lessor retained a meaningful reversionary interest.

The first factor, as the court in *QDS* noted, is not particularly useful in that regard. An analysis of the nominality of the purchase option is a redundant examination of a factor necessarily considered before the court may turn to the reversionary interest question. *QDS*, 292 B.R. at 343 n. 20. Having determined under the Bright–Line Test that WorldCom has failed to introduce sufficient evidence to establish that the Basic Term Purchase Option is for nominal consideration, the Court sees no reason to reconsider that conclusion now. Similarly, it is not clear to the Court that analysis of the second *Addison* factor contributes any additional information relevant to the Court's conclusion. In addressing this factor, the court in *Bumgardner* referenced the lessee's argument that it had acquired an equity interest because the option price was less than the FMV of the goods. 159 B.R. at 585–586. Though the court ultimately concluded that the lessee had incorrectly compared the option price to the actual, rather than predicted, FMV of the goods, the court did not dispute that this was the proper means of analyzing this factor. In asking whether the lessee has an equity interest, the Court is essentially examining whether the contractual option price was set lower than the predicted FMV of the goods in order to reflect the equity interest in the goods that the lessee had previously accumulated, presumably by paying more in "rent" than the parties would have agreed to in the absence of an intent to allow the lessee to accumulate such equity. Again, however, this analysis merely asks in different terms whether the option price is nominal. Hypothetically, a lessee could have an equity interest in the leased goods

even where the option price is not nominal, such as where the option price is less than the predicted FMV of the goods, but not so much less as to compel the conclusion that the option price is nominal.[13] However, given that the predicted FMV of the USL Equipment has not been established, the Court is unable to determine whether WorldCom has acquired an equity interest on that basis.

■ Nonetheless, the Court concludes that WorldCom has adduced sufficient evidence to create an issue of material fact as to whether GE possesses a meaningful reversionary interest in the USL Equipment. WorldCom has argued, and GE does not dispute, that it is effectively precluded from exercising the Renewal Term Return Option because the USL Equipment cannot be easily distinguished from like-equipment leased or purchased pursuant to other agreements. WorldCom notes:

> [T]he specific items constituting the [USL Equipment] are a fungible part of a much larger pool of nearly identical telecommunications equipment that was acquired by MCI at substantially the same time (i.e. the Nortel Equipment). None of the specific items constituting the [USL] Equipment are identified by serial number in the Agreement or in any related documents, but only by fungible part numbers and equipment type descriptions. Plaintiff's Reply, pg. 24.

WorldCom argues that these facts demonstrate that GE must have recognized at the inception of the Agreement that it would be neither practical nor possible for WorldCom to return the USL Equipment upon expiration of the Renewal Term. As

---

**13.** Though the statutory language suggests, and WorldCom argues, that the Basic Term Purchase Option is nominal if it is absolutely less than the cost of performance, the Court does not believe this is an accurate statement

of the law. Rather, the court should "allow a substantial deviation from that value and yet conclude the amount is not 'nominal.'" White & Summers, § 30–3 at 10 (discussing comparison of the FMV and the option price).

a result, WorldCom argues, GE had no expectation that the equipment would be returned and therefore surrendered any reversionary interest it had in the equipment. *See Kimco Leasing,* 656 N.E.2d at 1218 ("If, however, the lessor cannot reasonably expect to receive back anything of value at the end of the lease, then the lease creates a security interest.").

While not denying that the USL Equipment cannot be easily identified and returned, GE argues in response that the terms of the Agreement evidence that GE did have such an expectation at the inception of the Agreement. GE notes first, that Section 6 of the Agreement provides a detailed list of procedures and guidelines for the return of the USL Equipment. GE highlights that Section 6 also provides that its provisions are the "essence of [the Agreement]" and that GE is entitled to specific performance of those provisions. GE further argues that the responsibility for ensuring the equipment could be returned rested with WorldCom, and that "a party can not by its own act place itself in the position of being unable to perform a contract then plead that inability to perform as an excuse for nonperformance." *Omni Investment Corp. v. Cordon Int'l Corp.,* 603 F.2d 81, 84 (9th Cir.1979). *See also* Restatement (Second) of Contracts § 261 (1981). Section 6 of the Agreement therefore demonstrates, GE concludes, that there was an expectation that WorldCom could return the equipment.

WorldCom in turn responds that other provisions of the Agreement suggest the opposite conclusion than the one urged by GE. WorldCom notes that Section 13 of the Agreement expresses GE's bargained-for right to require WorldCom to mark and track the USL Equipment, which right, WorldCom points out, GE did not exercise. WorldCom argues therefore that GE recognized the removal issue at the inception of the Agreement but failed to pursue it, demonstrating that GE did not retain a meaningful reversionary interest. WorldCom further notes that in no provision of the Agreement or related documents was the USL Equipment ever identified by serial number, even though the parties were aware WorldCom was leasing other similar equipment as part of the Nortel Purchase.

Courts have held that the practical inability of the lessee to return the leased goods due to the cost and difficulty of removal is evidence that a security interest was created. *See, e.g., Pillowtex,* 349 F.3d at 723; *In re Cook,* 52 B.R. 558, 563 (Bankr.D.N.D.1985); *WOCO v. Benjamin Franklin Corp.,* 20 UCC Rep. Serv. (Callaghan) 1015, 1021 (D.N.H.1976); *Meeker v. Fowler,* 35 Ill.App.3d 313, 341 N.E.2d 412, 416 (1976). Moreover, that WorldCom bore the responsibility for ensuring that the equipment could be returned is not clearly dispositive of the issue. Though the rule cited by GE is obviously of fundamental importance in contract law, it is not equally applicable here. Rather, because the Court is here looking at the facts to determine what type of arrangement was created, and not enforcing the contractual covenants of the Agreement, evidence that GE knew WorldCom would be practically unable to return the equipment is relevant to the Court's determination.

The Court finds, therefore, that WorldCom has satisfied its burden of persuasion sufficient to defeat GE's Motion for Summary Judgment. The next question then must be whether WorldCom has also satisfied its burden of proof to sustain its own Motion for Summary Judgment. The answer to this question must be negative however. Viewing the evidence in the light most favorable to GE, this Court must conclude that WorldCom has failed to carry its burden of proof. Issues re-

main as to whether the Basic Term Purchase Option was nominal consideration, and there is a notable paucity of information upon which this Court could rest a judgment WorldCom's favor. The Court is unwilling in the face of this evidentiary void to conclude that one factor is sufficient to justify recharacterizing the Agreement.

## VIII. Additional Claims

As previously noted, the parties have raised a number of additional claims relating to disposition of the USL Equipment and remedies. As the Court has not determined whether the Agreement constitutes a lease or a security arrangement, the Court does not reach these issues.

## IX. Conclusion

Based upon the foregoing, the Court DENIES both parties' Motions for Summary Judgment. The Debtor is to settle an order consistent with this opinion. The parties should contact the Court to schedule a pre-trial hearing.